**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 0 7 2014

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

NUCOR STEEL – ARKANSAS;
NUCOR YAMATO STEEL COMPANY

CIVIL ACTION NO.: *3:14cv0193-JLH*

**Plaintiffs**

v.

JUDGE: *Holmes*

BIG RIVER STEEL, LLC

MAGISTRATE JUDGE: *Kearney*

**Defendant**

**COMPLAINT**

I.   **INTRODUCTION**

Nucor Steel – Arkansas ("NSA") and Nucor-Yamato Steel Company ("NYS"), collectively "Nucor," file this Complaint against Defendant, Big River Steel, LLC ("BRS"), and shows the Court as follows:

II.   **PARTIES**

1.    NSA operates a steel mill located at 7301 East County Road 142, near Blytheville, in Mississippi County, Arkansas.   NSA operates its mill pursuant to Arkansas Department of Environmental Quality ("ADEQ") Operating Air Permit No. 1139-AOP-R18, as well as other permits issued by ADEQ.   NSA's mill has been subject to review under the Prevention of Significant Deterioration ("PSD") provisions of the Clean Air Act ("CAA") and Arkansas Pollution Control & Ecology Commission ("APC&EC") Reg. 19, Chapter 9.   NSA's air permit is issued pursuant to the Part 70 Operating Permit regulations of the CAA, and APC&EC Reg. 26.

2.      NYS operates a steel mill located at 5929 East Highway 18, near Blytheville, in Mississippi County, Arkansas.  NYS operates its mill pursuant to ADEQ Operating Air Permit No. 0883-AOP-R9, as well as other permits issued by ADEQ.  NYS's mill has been subject to review under the PSD provisions of the CAA and APC&EC Reg. 19, Chapter 9.  NYS's air permit is issued pursuant to the Part 70 Operating Permit regulations of the CAA, and APC&EC Reg. 26.

3.      Defendant, BRS, plans to build a new greenfield steel mill located at 2027 E. State Highway 198, near Osceola, in Mississippi County, Arkansas, and has in fact commenced construction activities on the proposed site on or about August 4, 2014.

### III.      JURISDICTION AND VENUE

4.      This suit arises under the CAA, 42 U.S.C. §7401, *et seq.*, including:

> A.      the Arkansas State Implementation Plan ("SIP"), approved by the Environmental Protection Agency ("EPA") pursuant to 42 U.S.C. §7410 to implement the CAA's National Ambient Air Quality Standards ("NAAQS"), 40 C.F.R. Part 52, Subpart E, including the PSD provisions of the SIP;

> B.      the operating permit requirements of title V of the CAA, 42 U.S.C. §7661, *et seq.*, as implemented through the APC&EC regulations implementing title V.

5.      In this suit, Nucor seeks to prevent the commencement or continuation of any construction of a major facility by BRS under Operating Air Permit No. 2305-AOP-R0, which is in violation of the CAA (42 U.S.C. §§ 7604, 7475, 7661c); NAAQS (40 C.F.R. Part 50); the rules regarding PSD (40 C.F.R. § 52.21); and the rules regarding title V Operating Permits (40

2

C.F.R. Part 70), all of which are part of the federally approved Arkansas SIP, as well as Arkansas Water and Air Pollution Control Act, Ark. Code Ann. § 8-4-101, *et seq.*, and administrative procedures and substantive rules of the APC&EC, including its Administrative Procedures (Regulation 8), the Arkansas State Implementation Plan (Regulation 19), and the Arkansas Operating Permit Program (Regulation 26).

6.      Nucor's claims against BRS are authorized by the citizen suit provision of section 304 of the CAA, 42 U.S.C. §7604(a). This Court has jurisdiction over Nucor's claims pursuant to 42 U.S.C. §7604 and 28 U.S.C. §1331.

7.      Section 304(a)(1) of the CAA authorizes:

[A]ny person [to] commence a civil action on his own behalf . . . against any person … who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation. 42 U.S.C. § 7604(a)(1).

8.      Section 304(a)(3) of the CAA also authorizes suit against:

any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality . . . or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit. 42 U.S.C. § 7604(a)(3).

9.      Section 304 of the CAA defines "emission standard or limitation" as:

(1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard … or (4) any other standard, limitation, or schedule established under any permit listed pursuant to subchapter V of this chapter or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations.

10.     The proposed BRS facility is located in Mississippi County, Arkansas, and emissions from the facility will impact the air quality in Mississippi County, including at the NSA and NYS facilities.

3

11.     A copy of this Complaint for Injunctive Relief and Civil Penalties will be served on the Attorney General of the United States and the Administrator of the EPA, pursuant to 42 U.S.C. §7604(c)(3) and Fed. R. Civ. P. 4(i).

12.     Venue is proper in the Eastern District of Arkansas pursuant to 28 U.S.C. §1391(b)(1) and (2) and 42 U.S.C. §7604(c).

## IV.     NOTICE

13.     Pursuant to Section § 304(b)(2) of the CAA, 42 U.S.C. 7604(b)(2), and 40 CFR § 54, Nucor notified BRS of their violations of the CAA and of Nucor's intent to sue under the CAA by letter dated May 30, 2014 and sent via certified mail ("Notice Letter"). A true and accurate copy of the Notice Letter is attached as Exhibit 1. Nucor also sent copies of the Notice Letter to the Administrator of the EPA and the Director of the ADEQ.

14.     More than sixty days have passed since Nucor mailed BRS the Notice Letter. The CAA violations complained of in the Notice Letter are of a continuing nature, are ongoing, or are reasonably likely to recur. BRS remains in violation of the CAA. As of the filing of this Complaint, neither EPA nor Arkansas has commenced an enforcement action to redress the violations identified in the Notice Letter.

15.     BRS has not responded in any manner to Nucor's Notice Letter.

## V.     PROCEDURAL BACKGROUND

16.     On January 30, 2013, BRS filed its first air permit application for the proposed BRS Facility with ADEQ. The application related to a proposal by BRS to build and operate a new greenfield steel mill located at 2027 E. State Highway 198, near Osceola, in Mississippi County, Arkansas.

4

17.     Because the January 30, 2013, air permit application was incomplete, confusing, erroneous, and contradictory, ADEQ required BRS to resubmit the air permit application.

18.     On March 5, 2013, BRS filed its first revision to the original air permit application, including an analysis of projected air quality impacts from the BRS Facility.

19.     The application, as revised, was deemed administratively complete by ADEQ on March 14, 2013, and notice of receipt of the application was published on or about March 18, 2013.

20.     Due to errors, design and calculation changes, and ongoing and confusing supplementary information submitted to ADEQ by BRS, and in an attempt to provide proper notice of the application to the public and other interested persons, ADEQ required BRS to submit another complete revised air permit application.

21.     This revised application was dated June 21, 2013, and was received by ADEQ, in part, via email on June 21, 2013, and the paper copy was received by ADEQ on Monday, June 24, 2013 ("Application, Rev. 2").

22.     No public notice of the filing of Application, Rev. 2 was provided by ADEQ or BRS.

23.     One day after receipt of the Application, Rev. 2 by ADEQ, on June 25, 2013, ADEQ issued a draft permit for the BRS Facility ("Draft Permit") and an accompanying Statement of Basis ("SOB").

24.     Notice of the Draft Permit was published on June 27, 2013.

25.     ADEQ provided a public comment period on the Draft Permit from June 27, 2013 through July 30, 2013.

26.     On July 30, 2013, ADEQ held a combined public meeting and public hearing on the Draft Permit in Osceola, Arkansas.

27.     During the public comment period, written comments were submitted on the draft permit by BRS, Nucor, the EPA, and the Federal Land Manager for the Mingo Wilderness ("FLM").

28.     Nucor timely submitted its comments dated July 29, 2013.

29.     ADEQ issued the Final Permit ("Permit") to BRS on September 18, 2013 (Operating Air Permit No. 2305-AOP-R0).

30.     Nucor timely submitted a Third Party Request for Commission Review and Adjudicatory Hearing to the APC&EC on October 17, 2013, as required by Arkansas law and APC&EC Reg. 8.603(B).

31.     An evidentiary hearing on the merits commenced on February 18, 2014 and continued through February 21, 2014 before an Administrative Hearing Officer ("AHO").

32.     On April 25, 2014, APC&EC entered an Order upholding the Permit.

33.     On May 9, 2014, Nucor filed its Notice of Appeal and Request for Stay in the Circuit Court of Mississippi County, Arkansas, appealing the APC&EC's Order. On July 15, 2014, Nucor's Appeal was transferred from the Circuit Court of Mississippi County, Arkansas to the Arkansas Court of Appeals. The record of the Appeal soon will be filed with the Clerk of the Arkansas Court of Appeals.

34.     Nucor has exhausted its administrative remedies as required by law.

35.     On May 30, 2014, pursuant to Section 304 of the CAA, 42 U.S.C. § 7604(b)(1)(A), Nucor provided 60 days prior notice of violations and intent to file a citizen suit

for a violation of an air standard to the Administrator of the EPA, the State, and BRS, the alleged violator of the standard.

36.     More than sixty days have passed since Nucor provided notice of intent to file this suit to BRS, the Administrator and the State.

## VI.     STANDING

37.     BRS's violation of the PSD rules and title V rules injures Nucor for numerous reasons.

38.     The Nucor mills both are located in the same Clean Air Act Air Quality Control Region ("AQCR") as the BRS Facility, i.e., AQCR 20, the Northeast Arkansas Intrastate Air Quality Control Region. See 40 C.F.R. §81.139.

39.     The Nucor mills also are located in the same county, Mississippi County, and approximately 20 miles northeast of the site of the proposed BRS Facility.

40.     The wind blows most often from the site of the proposed BRS Facility in the direction of the Nucor mills.

41.     Numerous businesses that support the Nucor mills also are located in the AQCR 20 and in Mississippi County, and operate under air permits issued by ADEQ.

42.     Emissions of air pollutants from the BRS Facility will impact the air quality in Mississippi County, including at Nucor's mills and ancillary facilities located in Mississippi County, Arkansas.

43.     The interests of Nucor will be adversely affected by pollution from the BRS Facility because the level of pollutants to be discharged from the BRS Facility will degrade air quality, injuring and/or damaging wildlife, vegetation, water quality, and real estate in property owned by Nucor and/or used by Nucor employees.

44.     The BRS Facility emissions will negatively impact Nucor's employees' health and productivity, which impacts the operations at Nucor's facilities.

45.     Nucor has a practical, economic interest in maintaining a healthy, contented, and motivated workforce, as well as a pool of healthy potential employees. Having healthy employees, and a healthy potential workforce pool, helps minimize the amount of time that Nucor's employees miss at work due to illness, thus preventing scheduling issues, missed shifts, sick leave and other loss.

46.     Without a healthy and fully staffed workforce, Nucor's mills would be unable to maintain fully operational status and the production of the mills would suffer if full operational status were impacted by workforce availability.

47.     For these reasons, Nucor clearly has a vital interest in the air quality of the region, including Mississippi County, Arkansas, because if the air quality goes down, the productivity of Nucor's workforce will likewise go down, hindering Nucor's ability to generate revenue and decreasing the value of Nucor's Arkansas facilities.

48.     Consequently, Nucor has an interest in air quality in Mississippi County, Arkansas and in the AQCR, and in permits issued by ADEQ that affect such air quality and that affect the air quality attainment status of Mississippi County under the Clean Air Act, and the availability of PSD increment in Mississippi County necessary for future growth.

49.     Nucor is also subject to the same applicable requirements as the BRS facility, and Nucor will have to comply with such applicable requirements for future modifications to its facilities under permits also issued by ADEQ, or Nucor will have to consider the effect of ADEQ and EPA's disparate implementation and enforcement of such applicable requirements in making investment decisions for future modifications at the Arkansas mills.

8

50. BRS's violation of the PSD and title V rules, resulting in flawed Permit limits for its facility puts Nucor at a competitive disadvantage (a) as to permits that ADEQ issues to Nucor that include or address applicable requirements that should have been but were not included in or addressed by the BRS permit, or (b) as to permits issued to Nucor by ADEQ on which EPA subsequently objects – either on its own or in response to a petition to object under 42 USC §7661d – for failure to comply with applicable requirements that should have been included in the BRS permit as alleged by Nucor.

51. In either case, the regulatory obligations, costs and burdens to Nucor relative to the BRS Facility would increase, thereby putting Nucor at a competitive disadvantage to BRS and causing Nucor a concrete competitive injury.

52. Additionally, the construction and operation of the BRS Facility near Osceola will result in an exceedance of the National Ambient Air Quality Standard ("NAAQS") and consumption of the PSD increment for particulate matter, at least for $PM_{2.5}$.

53. Exceedance of the NAAQS may result in Mississippi County being reclassified as "nonattainment," or may result in ADEQ taking action to limit emissions from other facilities in Mississippi County to prevent Mississippi County from being reclassified as "nonattainment."

54. Once the County is classified as nonattainment, Nucor is immediately burdened by additional regulatory requirements, including potentially the requirement to "offset" any additional emissions.

55. Further, the ADEQ must develop a State Implementation Plan ("SIP") to restore attainment of the NAAQS, which will add to the costs of future expansions or modifications of the Nucor mills or of Nucor's support facilities and customers located in Mississippi County.

56.     The SIP is required to include control measures reducing emissions of the pollutant, $PM_{2.5}$, and its precursors, $NO_x$ and $SO_2$, to a level necessary to achieve the NAAQS.

57.     Because the County would be in nonattainment, the SIP will require reductions in $PM_{2.5}$ direct emissions, $NO_x$ emissions and $SO_2$ emissions sufficient to demonstrate attainment of the NAAQS under design conditions (e.g., representative worst case as defined by EPA guidance).

58.     As other major sources of $PM_{2.5}$, $NO_x$ and $SO_2$, the Nucor facilities will be asked to reduce emissions from their electric arc furnaces, ladle metallurgy furnaces, tunnel furnaces, reheat furnaces, miscellaneous natural gas combustion operations (boilers, ladle preheaters and dryers, tundish preheaters and dryers, holding stations, etc.) and cold mill operations (annealing furnaces, galvanizing lines, and pickling operations) to offset the wrongful emissions increases from the BRS Facility.

59.     The purpose of the PSD modeling is to ensure that the addition of a new source, such as BRS, does not cause or contribute to the county going into nonattainment so that the public and existing sources do not suffer adverse air and economic consequences of development in contravention of the CAA's requirements.

60.     By operation of the CAA, there is a limited "market" for $PM_{2.5}$ air emissions in Mississippi County, and reclassification of Mississippi County as non-attainment for $PM_{2.5}$ would make that "market" even smaller, to the detriment of Nucor.

61.     Furthermore, BRS's permitted BACT limits for $PM_{2.5}$ for natural gas combustion sources and electric arc furnaces are far below other steel mills and have not been demonstrated to be achievable, and upon information and belief are not achievable.

62.     Establishment of BACT limits for $PM_{2.5}$ for natural gas combustion sources and electric arc furnaces based on emission factors and limits that have not been demonstrated to be achievable will injure Nucor because it will add to the cost of expansions or modifications of the Nucor mills or of Nucor's support facilities and customers located in Mississippi County.

63.     All combustion activities at the Nucor facilities, including without limitation electric arc furnaces, ladle metallurgy furnaces, tunnel furnaces, reheat furnaces, miscellaneous natural gas combustion operations (boilers, ladle preheaters and dryers, tundish preheaters and dryers, holding stations, etc.) and cold mill operations (annealing furnaces, galvanizing lines, and pickling operations), are thus impacted by BRS's failure to comply with the PSD and title V rules.

64.     All future combustion activities at the Nucor facilities, and by surrounding facilities that purchase product from or that support the Nucor facilities, are thus impacted by BRS's failure to comply with the PSD and title V rules.

65.     All current and future material handling operations, to the extent that they generate $PM_{2.5}$, whether from the Nucor facilities or from surrounding facilities that purchase product from or that support the Nucor facilities, are thus impacted by BRS's failure to comply with the PSD and title V rules.

66.     The injuries set forth above constitute an injury-in-fact – specifically, an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.

67.     This injury is "particularized" because it affects Nucor in a personal and individual way.

68.     Further, Nucor asserts that there is a causal connection between the injuries alleged herein and the conduct complained of – in other words, Nucor's injuries are fairly traceable to the BRS's failure to comply with the PSD and title V rules and are redressable by this Court.

69.     Finally, Nucor asserts that it is likely, as opposed to merely speculative, that its injury will be redressed by a favorable decision from this Court revoking the BRS Permit and staying continued construction activities by BRS until such time as BRS can obtain a valid and federally enforceable PSD and title V air permit.

## VII.     STATUTORY BACKGROUND

70.     The purpose of the CAA is the protection and enhancement of the Nation's air resources to promote the public health and welfare and the productive capacity of its population. 42 U.S.C. § 7401(b)(1), CAA § 101(b)(1).

71.     The BRS Facility is a new major stationary source subject to the PSD preconstruction permit review analysis under governing State and Federal law.

72.     Although some differences exist between the provisions of Arkansas law and Federal law regarding PSD preconstruction permits requirements, as far as the BRS permit subject to this proceeding is concerned, most differences are irrelevant. Accordingly, any provision of either Arkansas state law or Federal law pertaining to PSD permitting and review are equally applicable to the BRS permit.

73.     Section 165(a) of the CAA requires a person seeking a PSD permit to demonstrate that "emissions from construction or operation of such facility will not cause or contribute to … air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year

[and] (B) national ambient quality standard in any air quality control region ..." 40 U.S.C. § 7475(a)(3).

74.     A NAAQS is an air pollution concentration limit in the ambient air that has been set by EPA to protect public health and welfare. Compliance with any NAAQS is based upon the total estimated air quality, which is the sum of the ambient estimates resulting from existing sources of air pollution and the modeled ambient impact caused by the potential to emit from the new major source.

75.     NAAQS have been established for: carbon monoxide (CO), sulfur dioxide ($SO_2$), ozone, nitrogen dioxide ($NO_2$), particulate matter less than 10 microns in diameter ($PM_{10}$) and less than 2.5 microns in diameter ($PM_{2.5}$), lead (Pb) and Ozone.

76.     Section 165(e)(1) of the CAA requires as part of the demonstration necessary to obtain a PSD construction permit "an analysis ... by the major emitting facility applying for such permit, of the ambient air quality at the proposed site and in areas which may be affected by emissions from such facility for each pollutant subject to regulations under this chapter which will be emitted from such facility." 42 U.S.C. § 7475(e)(1).

77.     The EPA requires an applicant to demonstrate, for each pollutant emitted from the proposed source that is subject to the PSD requirement, that the allowable emissions from the proposed source, combined with other applicable emissions increases and reductions in the relevant geographic area, will not cause or contribute to air pollution that will exceed the "maximum allowable increase" of each pollutant over the baseline concentration in any area or result in a violation of the NAAQS for such pollutants in any AQCR. 40 C.F.R. §§ 51.166(k) and 52.21(k)(1).

78.     Air quality impacts of a proposed new major source are modeled by following the *Guideline on Air Quality Models*, commonly referred to as Appendix W. 40 C.F.R. Part 51, Appendix W.

79.     The preface to Appendix W provides that, "The [Guideline] provides a common basis for estimating the air quality concentration of criteria pollutants used in assessing control strategies and developing emission limits."

80.     As part of the air quality analysis required for PSD permit applications, Section 165(e)(2) requires that a permit applicant gather continuous air quality monitoring data for a period of one year prior to the submittal of a PSD permit application. 42 U.S.C. § 7475(e)(2).

81.     Where a permit incorporates the requirements of the PSD program, the permit must fully comply with PSD requirements.

82.     The Arkansas SIP incorporates 40 C.F.R. § 52.21(l), which provides, "*Air quality models.* (1) All estimates of ambient concentrations required under this paragraph shall be based on applicable air quality models, databases, and other requirements specified in appendix W of part 51 of this chapter (Guideline on Air Quality Models)."

83.     Significant deterioration occurs when the amount of new pollution from the new source would exceed the applicable PSD increment. The EPA has established PSD increments for $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$.

84.     The BRS Facility is subject to PSD review for $NO_2$, CO, PM, $PM_{10}$, $PM_{2.5}$, $SO_2$, VOC, lead and greenhouse gases. 40 CFR § 52.21; APC&EC Reg. 19.904.

85.     Because it is subject to PSD review and because it independently meets the criteria as a "major source," the BRS Facility is a "major source" for purposes of title V of the CAA.

86.     Arkansas is a SIP-approved state but, as is relevant to the BRS permit under review, there are few relevant differences between Arkansas law and Federal PSD law set forth in 40 C.F.R. 52.21, except that the Arkansas SIP does not contain certain provisions necessary for federal enforceability of PM2.5 emission limits in PSD Permit, as alleged more fully below

87.     For a PSD permit to be issued to BRS (and for construction to begin) Section 165 of the CAA, 42 U.S.C. § 7475, requires the following, among other things:

    a.    A demonstration that the potential to emit criteria pollutants from the BRS Facility will not cause, or contribute to, air pollution in excess of any PSD increment or any NAAQS;

    b.    Use of Best Available Control Technology ("BACT");

    c.    An analysis of air quality impacts projected as a result of growth associated with the facility;

    d.    A pre-construction air quality analysis of the ambient air quality at the proposed BRS Facility site and in areas which may be affected by emissions from the BRS Facility;

    e.    A year of pre-construction ambient air monitoring;

    f.    Public notice and comment; and

    g.    A permit that contains emission limitations that conform to the requirements of PSD review.

88.     CAA title V provisions for operating permits also must contain federally enforceable permit terms and conditions necessary to ensure compliance with the PSD requirements.

89.     The PSD increments establish maximum allowable increases relative to the baseline concentrations of regulated air pollutants and are intended to limit new pollution in an area in order to maintain attainment with the NAAQS.

# VIII. CLAIMS FOR RELIEF

A.     **COUNT I: Failure to Conduct Pre-Construction Monitoring for PM$_{2.5}$ at the Site of the BRS facility**

90.     The allegations in all of the preceding paragraphs are incorporated herein by reference.

91.     The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 1 on pages 7 through 9 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

92.     BRS failed to conduct site-specific pre-construction monitoring of PM$_{2.5}$ and PM$_{10}$ emissions and rather relied (with ADEQ's support) on site-specific post-construction monitoring.

93.     Pre-construction monitoring should have been required because: (a) all other existing monitors were over 40 kilometers from the proposed site; (b) both PM$_{10}$ and PM$_{2.5}$ impacts due to the proposed facility were greater than their respective SMCs (prior to the SMCs being vacated by the *Sierra Club* decision).

94.     Assessing air quality at the BRS site through post-construction monitoring is in direct conflict with 42 U.S.C. § 7475(e) and the basic premise of PSD being a pre-construction permit program. Post-construction monitoring is an illegal substitute for the pre-construction monitoring requirement under Section 165(e).

95.     Upon information and belief, BRS has failed to comply with the requirements of 42 U.S.C. § 7475(e) and has failed to demonstrate that it will not cause or contribute to a violation of the NAAQS in violation of 40 U.S.C. §7475(a)(3) and 40 C.F.R. §52.21(k)(1) by failing to conduct site-specific pre-construction monitoring to ascertain the background

concentration at the proposed BRS facility, when the $PM_{2.5}$ background values recorded by Arkansas monitors combined with the modeled impacts of the proposed BRS Facility exceeded the $PM_{2.5}$ NAAQS.

**B.**   **COUNT II: Exclusion of Areas Based on being Below the $PM_{2.5}$ significant impact level ("SIL") after those SILs were vacated.**

96.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

97.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 2(a) on pages 9 through 11 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

98.    As part of the air quality analysis required for PSD permit applications, Section 165(e)(2) requires that a permit applicant gather continuous air quality monitoring data for a period of one year prior to the submittal of a PSD permit application. 42 U.S.C. § 7475(e)(2).

99.    EPA had previously stated that if a permit applicant demonstrates that the air quality impact from the new source or modification alone is below the SILs set forth in the regulation, the applicant will be deemed to have satisfied its obligation to demonstrate that emissions from the new source or modification, in combination with other applicable emissions increases or reductions, would not cause or contribute to a violation of the $PM_{2.5}$ NAAQS or exceed the $PM_{2.5}$ increment. 40 C.F.R. §§ 51.166(k) and 52.21(k)(2) (since vacated).

100.    In *Sierra Club v. EPA*, 705 F.3d 458, 468 (D.C. Cir. 2013), the Court vacated and remanded the $PM_{2.5}$ SILs regulations then codified at 40 C.F.R. §§ 51.166(k)(2) and 52.21(k)(2). Thus, the $PM_{2.5}$ SILs were no longer valid as of January 22, 2013.

17

101.    On December 9, 2013 EPA promulgated a final rule removing the $PM_{2.5}$ SILs and SMC provisions from the PSD regulations in the C.F.R. Prevention of Significant Deterioration for Particulate Matter Less Than 2.5 Micrometers—Significant Impact Levels and Significant Monitoring Concentration: Removal of Vacated Elements, 78 FR 73698-01.

102.    Thus, because the $PM_{2.5}$ SILs had been vacated prior to March 14, 2013, the date on which the BRS permit application was deemed administratively complete, the former $PM_{2.5}$ SILs have no applicability to the modeling required for the BRS Permit.

103.    Despite the *Sierra Club* court's ruling vacating the $PM_{2.5}$ SILs and the fact that no SILs for $PM_{2.5}$ were subsequently promulgated by EPA, BRS used the $PM_{2.5}$ SIL to exclude certain areas from modeling. BRS conducted its modeling using only receptor points that fell within the $PM_{2.5}$ Significant Impact Area ("SIA") as defined by the SIL.

104.    By exempting all receptors which had values less than the vacated SIL value, the model underrepresented the area of significant impact.

105.    Given that the modeled $PM_{2.5}$ cumulative impact for the BRS Facility is already near the NAAQS limit, analyzing these non-exempt areas for the cumulative total will result in an exceedance of the NAAQS.

106.    Upon information and belief, BRS has failed to demonstrate that it will not cause or contribute to an exceedance of the NAAQS in violation of 40 U.S.C. §7475(a)(3) and 40 C.F.R. §§ 51.166(k)(1) and 52.21(k)(1)(i) by improperly excluding receptors based on being below the $PM_{2.5}$ SIL after the SILs had been vacated.

**C.    COUNT III: Failure to Place Receptors on Public Road and at and/or around Neighboring Facilities.**

107.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

108.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 2(b) on pages 11 through 13 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

109.    The CAA requires that the NAAQS must be met in all areas of "ambient air," which is defined as "that portion of the atmosphere, external to buildings, to which the general public has access."  BRS was required to include receptors located along public roadways and along neighboring facilities' fence lines pursuant to 40 C.F.R. § 50.1(e).

110.    BRS failed to include properly spaced and located boundary receptors along County Road 198 which traverses the transportation corridor on the south side of the Bunge Facility, a terminal grain elevator, and the north side of Viskase, a food products manufacturing facility, and the proposed BRS Facility, even though this roadway is located between two major industrial facilities and is accessible to the public.

111.    BRS failed to place receptors around its neighboring facilities Viskase and Bunge. BRS simply removed receptors from its cartesian receptor grid to create a "hole" in the grid to represent the on-site air of Bunge and Viskase facilities, rather than creating a specific set of boundary receptors around those facilities as it did for the BRS Facility and Plum Point facility fence lines.

112.    The atmosphere inside of a neighboring or nearby facility's fence line qualifies as "ambient air" for purposes of a modeling facility's emissions, i.e., the atmosphere inside one facility is ambient air in relation to another facility's emissions. *Interpretation of "Ambient Air" In Situations Involving Leased Land Under the Regulations for Prevention of Significant*

19

*Deterioration (PSD)*, Memorandum from Stephen D. Page, Director US EPA OAQPS, to Regional Air Division Directors, June 22, 2007.

113.    When multiple nearby facilities are considered in a modeling analysis (as is the case for the BRS analysis), separate model runs must be completed for each possible combination of ambient air receptors and facility emissions.

114.    40 C.F.R. § 52.21(l)(1) mandates compliance with Appendix W in air modeling.

115.    BRS has failed to demonstrate that it will not cause or contribute to an exceedance of the NAAQS in violation of 40 U.S.C. §7475(a)(3) and 40 C.F.R. §§ 51.166(k), 52.21(k)(1) and 52.21(l)(2) by failing to place receptors along the public road and by not including defined receptors at and around the Bunge and Viskase facilities, which understates the potential ambient air quality impacts from the combination of existing facilities and the proposed.

**D.    COUNT IV: Selection of Non-Representative Background Monitor for PM$_{2.5}$.**

116.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

117.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 3 on pages 13 through 17 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

118.    Appendix W requires that "[t]he most appropriate data available should always be selected for use in modeling analyses," 40 C.F.R. Part 51, App. W, § 8.0(a), and cautions that "[a]n appropriate data validation procedure should be applied to the data prior to use," 40 C.F.R. Part 51, App. W, § 8.2.1(b).

119.    For purposes of its air quality impacts analysis, BRS was required to choose a regional site "that is located away from the area of interest but is impacted by similar natural and distant man-made sources," to represent background concentrations of pollutants.  40 C.F.R. Part 51, App. W, § 8.2.2(c).

120.    BRS selected the background monitor at Dyersburg, Tennessee as its regional site to determine background $PM_{2.5}$, in violation of Appendix W, § 8.2.2.c. which provides that a "representative" regional monitor be impacted by "similar natural and distant man-made sources," which should include proximity to the proposed site, similar climate and land use regimes, wind flow patterns identifying influencing regional and local sources on existing monitors, and the type of monitoring objective for each monitor site.  The Dyersburg, Tennessee monitor fails to meet these criteria.

121.    The Dyersburg, Tennessee monitoring site contains two monitors, one reflecting a $PM_{2.5}$ background concentration of $10.4\mu g/m^3$, and the other as $9.44\mu g/m^3$. Without explanation, BRS used the lower value as the representative background concentration for $PM_{2.5}$.

122.    The Dyersburg, Tennessee monitor(s) are not representative of Osceola, Arkansas because Dyersburg is a significant distance from the proposed BRS Facility. Section 2.4.1 of the Ambient Monitoring Guidelines for the Prevention of Significant Deterioration (EPA-450/4-87-007) (May 1987) states that where the proposed source is in an area of multisource emissions and flat terrain, then existing data from a nearby monitor may be used if the monitor is within 10 kilometers of the proposed emission sources or within 1 kilometer of the area of maximum concentration from existing sources or the area of combined maximum impact from existing and proposed sources.

123.    The Dyersburg, Tennessee monitor is not representative of Osceola, Arkansas because the prevailing wind direction in the area of the proposed BRS Facility is from southwest to northeast, *i.e.*, the proposed BRS site is downwind and under the influence of $PM_{2.5}$ originating from the Memphis metropolitan area. By choosing the Dyersburg monitor BRS significantly underrepresented the $PM_{2.5}$ influence from the Memphis metropolitan area.

124.    The Marion, Arkansas monitoring site (Site No. 05-035-0005) is representative of the proposed BRS Facility and should have been used by BRS. The Marion, Arkansas, monitor is not only closer to the proposed BRS facility but is more representative of Osceola, Arkansas.

125.    Had BRS used the proper Marion monitor, it would have modeled an exceedance of the annual $PM_{2.5}$ NAAQS and would have failed to make the PSD demonstration necessary to obtain the Permit.

126.    Had BRS used the background $PM_{2.5}$ concentrations from any of the Arkansas monitors (Marion, Newport, or Helena), when combined with BRS's modeled prediction of its direct $PM_{2.5}$ emissions impact, BRS would have shown an exceedance of the NAAQS and would have failed to make the PSD demonstration necessary to obtain the Permit.

127.    BRS chose instead to use a non-representative monitor knowing it would model just below the $PM_{2.5}$ NAAQS limit.

128.    Upon information and belief, BRS has failed to demonstrate it will not cause or contribute to a violation of the NAAQS in violation of 40 U.S.C. §7475(a)(3) and 40 C.F.R. §§ 51.166(k) and 52.21(k)(1) and violated the selection requirements contained in Appendix W, § 8.3 by using a non-representative monitor to model for background $PM_{2.5}$ emissions.

E.    **COUNT V: Failure to Model or Otherwise Consider Secondarily Formed PM$_{2.5}$.**

129.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

130.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 4 on pages 17 through 21 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

131.    The proposed BRS Facility will emit significant amounts of the precursor emissions SO$_2$ and NO$_x$, leading to the formation of significant amounts of secondarily formed PM$_{2.5}$. The emissions of SO$_2$ and NO$_x$ from the proposed BRS Facility are permitted at 347.8 tons per year ("tpy") and 1,128.4 tpy, respectively (1,476.2 tpy total), well above the 40 tpy level threshold for the assessment of secondary PM$_{2.5}$. *See* Implementation of the New Source Review (NSR) Program for Particulate Matter Less Than 2.5 Micrometers (PM$_{2.5}$), 73 FR 28321-02, 28333 (setting significant emissions rates (SER) for PM$_{2.5}$ precursors at the level of 40 tpy).

132.    BRS's proposed facility will emit a substantial amount of secondary PM$_{2.5}$.

133.    The EPA has repeatedly promulgated rules which require the consideration of secondary PM$_{2.5}$ formed from precursor emissions, including 40 C.F.R. Part 51, App. W, §§ 5.1, 5.2.2.1, 73 Fed. Reg. 28,321, 28,326 (May 16, 2008), and 40 C.F.R. § 52.21(b)(23)(i).

134.    Arkansas has been required to consider PM$_{2.5}$ as part of its PSD review since 1997, when the first PM$_{2.5}$ NAAQS was promulgated by the EPA.

135.    As evidenced by EPA's considerable effort in developing the *Guidance for PM$_{2.5}$ Permit Modeling* (including consideration of the 2011 National Association of Clean Air Agencies Workgroup report and the public comments on the 2013 draft guidance), impacts from

secondary $PM_{2.5}$ emissions are an important part of the $PM_{2.5}$ NAAQS demonstration. 42 U.S.C. § 7475(a)(3); 40 C.F.R. § 52.21(k).

136.    By law, neither BRS nor ADEQ can simply ignore secondary $PM_{2.5}$ emissions altogether for their individual or collective convenience.

137.    Neither ADEQ nor BRS modeled or otherwise considered secondary formation of $PM_{2.5.}$ as a result of the BRS $F_{acility.}$

138.    In addition to being contrary to federal law, BRS's exclusion of secondary formation of $PM_{2.5}$ runs afoul of EPA guidance, including *Draft Guidance for PM₂₅ Permit Modeling,* (EPA 454/D-13-001, Public Review Draft March 4, 2013, U.S. Environmental Protection Agency, Research Triangle Park, NC) and *Guidance for PM₂₅ Permit Modeling,* (May 20, 2014, U.S. Environmental Protection Agency, Research Triangle Park, NC.)

139.    Considering the timing, the level of $PM_{2.5}$ precursor emissions, and the fact that the modeled $PM_{2.5}$ level in the BRS's modeling for primary $PM_{2.5}$ alone indicated emissions would be a mere 0.09 $\mu g/m^3$ lower than the NAAQS, BRS's complete disregard of secondary $PM_{2.5}$ is a violation of the PSD permit rule.

140.    Additionally, BRS chose an improper mix-and-match approach to following federal regulation and EPA guidance. BRS ignored federal regulation and EPA guidance on secondary formation of $PM_{2.5}$, namely 2010 and 2013 Memoranda from Stephen D. Page, Director, Office of Air Quality Planning and Standards, addressing Draft Guidance for $PM_{2.5}$ Permit Modeling, yet used that same guidance when it was to its advantage to do so.

141.    Upon information and belief, BRS failed to demonstrate that its emissions will not cause or contribute to an exceedance of the NAAQS in violation of 42 U.S.C. § 7475(a)(3) and 40 C.F.R. § 52.21(k) by failing to model or otherwise consider secondary $PM_{2.5}$ emissions.

24

**F.      COUNT VI: Failure to Include Natural Gas Sources in Modeling.**

142.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

143.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 5 through 5(a) on pages 21 through 23 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

144.    Numerous natural gas combustion sources were omitted from the Permit, specifically, sources SN-04 through SN-19, and from all modeling done by BRS in support of the Permit.

145.    Appendix W, Table 8-2, requires the use of the maximum allowable emission limit or federally enforceable permit limit for the source model input. 40 C.F.R. Part 51, App. W, Table 8-2. Subsection 52.21(l) makes compliance with Appendix W mandatory.

146.    Thus, BRS never performed the statutorily required modeling based on the permitted emission limits for all of the natural gas combustion sources included in the Permit.

147.    Modeling the proposed BRS Facility $PM_{2.5}$ emissions based on the final permit emission limits and including all omitted sources will result in a significant increase from the BRS modeled value of 2.47 $\mu g/m^3$ to a minimum of 2.79 $\mu g/m^3$, resulting in an exceedance of he annual $PM_{2.5}$ NAAQS.

148.    Upon information and belief, BRS violated 42 U.S.C. § 7475(a)(3), 40 C.F.R. §§ 52.21(k), (l) and (n), as well as Appendix W, by excluding natural gas emission sources SN-04 through SN-19 from its modeling.

## G.   COUNT VII: Failure to Correctly Model Melt Shop and Galvanizing Line Rooftop Fugitive Emissions.

149.   The allegations in all of the preceding paragraphs are incorporated herein by reference.

150.   The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in item Section 5(b) on pages 23 through 24 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

151.   BRS incorrectly modeled the Melt Shop and Galvanizing Line rooftop fugitive emissions, resulting in an underestimation of the concentrations of emitted pollutants, especially at receptors close to these sources.

152.   BRS's modeling took credit for all releases at a height twice the height that they were emitted. Additionally, the initial vertical dimensions ($\sigma_{zo}$) noted in Table C-2 of Appendix C to the Application, Rev. 2, as well as the input files for the dispersion modeling, were incorrect.

153.   This error in the Melt Shop and Galvanizing Line fugitive source characterization underestimated concentrations of emitted pollutants, especially at receptors close to these sources.

154.   Upon information and belief, BRS has not demonstrated that it will not cause or contribute to an exceedance of the NAAQS, in violation of 42 U.S.C. § 7475(a)(3), 40 C.F.R. §§ 52.21(k)(1) and (n), as well as Appendix W, by failing to properly model fugitive emissions from the Melt Shop and Galvanizing Line.

**H.    COUNT VIII: Failure to Consider Building Conditions and Downwash from the Bunge, Viskase, and Plum Point Facilities.**

155.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

156.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in item 5(c) on pages 24 through 25 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

157.    BRS failed to consider building conditions and downwash from three sites near the proposed BRS facility (Bunge, Viskase, and Plum Point) in the dispersion modeling, even though the area of maximum impacts was well within the potential zones of influence of buildings at these sites.

158.    The Bunge and Viskase facilities should have been considered in the modeling because (a) the maximum combined source impacts were in the vicinity of the Viskase and Bunge properties, (b) each facility has buildings that will influence the plume behavior with increased turbulence, and (c) the multi-source annual $PM_{2.5}$ concentration is just below the 12.00 $\mu g/m^3$ NAAQS.

159.    Upon information and belief, BRS violated 42 U.S.C. § 7475(a)(3), 40 C.F.R. §§ 52.21(k) and (n), as well as Appendix W, by excluding building conditions and downwash from nearby regional sources in its modeling supporting its Permit.

**I.    COUNT IX: Failure to Properly Model Fugitive Windblown Emissions.**

160.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

27

161.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 5(d) on page 25 of the Notice Letter and the allegations of that page is incorporated herein *in extenso* as fully as if retyped herein verbatim.

162.    BRS failed to properly model fugitive windblown emissions.

163.    In the wind speed data for the Blytheville meteorological data sets, only one hour of data over the whole period of records (43,824 hours) had a wind speed that met the 14 meters per second wind speed threshold to allow windblown dust.

164.    Upon information and belief, BRS has failed to demonstrate that it will not cause or contribute to an exccedance of the NAAQS, in violation of 42 U.S.C. § 7475(a)(3), 40 C.F.R. §§ 52.21(k) and (n), as well as Appendix W, by failing to properly model fugitive windblown emissions, which underestimates the emissions attributable to wind erosion from the scrap and slag piles.

J.      **COUNT X: Underestimation of Emissions from Storage Piles.**

165.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

166.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 5(e) on page 26 of the Notice Letter and the allegations of that page is incorporated herein *in extenso* as fully as if retyped herein verbatim.

167.    BRS underestimated emissions from the storage piles at the proposed BRS Facility.

168.    For Sources SN-99A and SN-99B, the surface area of each pile is calculated in Application, Rev. 2 as though it exists as a two-dimensional pile that encompasses the entire storage yard.

169.    In reality, these piles will exist in three dimensions and must be calculated as such to account for the surface area of the side of the pile.  Further, it is not logistically possible to store this material in one large pile.

170.    Accounting for the increased surface area that would result from multiple piles, as well as from three-dimensional piles, will greatly increase the particulate emissions and will cause or contribute to an exceedance of the NAAQS.

171.    Upon information and belief, BRS has failed to demonstrate that it will not cause or contribute to an exceedance of the NAAQS, in violation of 42 U.S.C. § 7475(a)(3), 40 C.F.R. §§ 52.21(k) and (n), as well as Appendix W, by underestimating the emissions from its storage piles in its modeling supporting its Permit.

K.    **COUNT XI: Failure to Model at Permitted Limits**

172.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

173.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 6 on pages 26 through 27 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

174.    BRS failed to model permitted limits.

175.    The Permit emission limits for several natural gas combustion sources were higher than the emission rates contained in the Application, Rev. 2 and in the modeling files submitted by BRS in support of the Permit.

176.    A comparison of Application, Rev. 2, Appendix C, Tables C-1 and C-2 $PM_{2.5}$ annual emission factors to the desired permit limits in the application determined that these permit limits were not modeled at their full value.

177.    Properly conducting modeling at the limits contained in BRS's Permit indicates that $PM_{2.5}$ emissions from the proposed BRS Facility will exceed the annual NAAQS for $PM_{2.5}$.

178.    Upon information and belief, BRS has failed to demonstrate that it will not exceed the annual $PM_{2.5}$ NAAQS, in violation of 42 U.S.C. §7475(a)(3) and 40 C.F.R. §§ 51.166(k) and 52.21(k)(1) and (n) by failing to model the Permit limits.

**L.    COUNT XII: Incomplete Design and Placement of Emissions Sources**

179.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

180.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 7 on pages 27 through 29 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

181.    BRS's Application, Rev. 2 contains an incomplete design and placement of all emission sources.

182.    Changes in the design and placement of emission sources will affect the accuracy of modeling results upon which the Permit was issued.  The Application, Rev. 2, contains several sections indicating that the design had not been finalized and was subject to change:

a.      Section 1.6 states that engineering work will continue on the engineering and layout of Phase II of the proposed BRS Facility while Phase I is being built.

b.      Section 2.1 "General Description" states: "It is important to note that the drawings provide preliminary information related to site layout, process areas, equipment and emission exhaust stacks. The information is subject to change pending final engineering …."

c.      The following Process Flow Diagram Figures all state that all equipment capacities or flow rates are "estimates and subject to change pending final engineering": Fig. 2-3a EAF Flux System Storage; Fig. 2-3b Flux and Carbon Injection Delivery to EAF; Fig. 2-4a LMF Flux System Storage; Fig. 2-4b Alloy Storage and Delivery System for LMF; Fig. 2-4c Alloy Delivery Systems for LMF; Fig. 2-5a Alloy Delivery System for RH-Degasser; and Fig. 2-7 Dust Collection System Phase I.

d.      Figure 2-7 of Application, Rev. 2, which concerns the dust collection system, states that "all flow rates are estimates and subject to change pending final engineering."

e.      Application, Rev. 2 did not consider the emissions or impacts of material delivery in product shipment by barge.  This omission is inconsistent with the Regulation 19.904 "alternative sites" analysis included in the introduction of the Permit, which states that access to the river is an important site criteria.

f.      Appendix C of the Application, Rev. 2, states "[t]he results provided in Table C-5 represent predicted impacts from modeling submitted for an earlier version of this application."  Because the January 2013 version did not include modeling, but the

31

March 2013 Revision 1 application did include modeling, it was concluded that the modeling referred to above came from the March 2013 application. The Appendix C text further states that project emissions have decreased and thus no new modeling was performed because decreased emissions indicates lower concentrations and no need to remodel. This was a flawed assumption which could affect the outcome of the modeling. For one, other parameters than just the emissions changed from the March 2013 to June 2013 modeling analysis. Stack heights were raised, sources moved and other unidentified changes were made which will affect the magnitude of the ambient impacts as well as the location where they occur. Thus, not remodeling all of the proposed facility changes ignores the fact that potentially more receptors could have had impacts greater than the applicable SILs and the area of significant impacts from the BRS Facility may have been larger. This fact was never objectively or quantitatively demonstrated.

183. Upon information and belief, under the circumstances of this case, because BRS's modeling showed that its impacts were so close to the $PM_{2.5}$ NAAQS, and because modeling of the final Permit limits showed exceedances of the $PM_{2.5}$ NAAQS, BRS has failed to demonstrate that it will not exceed the annual $PM_{2.5}$ NAAQS, in violation of in violation of 42 U.S.C. §7475(a)(3) and 40 C.F.R. §§ 51.166(k) and 52.21(k)(1), by relying on an incomplete layout and design of emission sources and processes.

M. **COUNT XIII: Improper Reduction of Emissions Rates from Bunge Grain Elevator.**

184. The allegations in all of the preceding paragraphs are incorporated herein by reference.

185.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 8 on pages 29 through 30 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

186.    BRS improperly reduced the emission rates from the neighboring Bunge grain elevator in its modeling.

187.    Following its submittal of Application, Rev. 2, BRS reduced the emissions from one of the Bunge sources by 50%, based on an assumption that the Bunge source would not operate 24 hours per day (as BRS had stated in its Application, Rev. 2), but would only operate 12 hours per day.

188.    There is no evidence that the Bunge source has established an appropriate operating factor, or of the Bunge source's actual operating factors over the most recent two years.

189.    BRS should have conducted a full two-year analysis to demonstrate what the actual two year emissions from these sources are.

190.    Upon information and belief, BRS failed to demonstrate that emissions from the BRS Facility will not cause or contribute to an exceedance of the NAAQS in violation of 40 U.S.C. §7475(a)(3) and 40 C.F.R. §§ 51.166(k) and 52.21(k)(1) by improperly reducing the emission rates for the Bunge facility in its air quality impact analysis, and by failing to conduct a full two-year analysis.

N.      **COUNT XIV: Failure to Conduct Proper Top-Down BACT Analysis.**

191.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

192.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 9(a) and Section 9(a)(i) on pages 30 through 31 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

193.    BRS was required by ADEQ to perform a five-step, top-down analysis of each pollutant for each emission source.

194.    While BRS represented that it performed a five-step, top-down analysis, in substance, the BACT analysis was wholly inadequate, and consequently, failed to satisfy PSD requirements.

195.    Throughout the BACT analysis in Application, Rev. 2, no cost effectiveness evaluation was performed on technically feasible control options, and a number of potential control technologies were either eliminated improperly or were not considered at all.

196.    Upon information and belief, BRS violated 40 C.F.R. § 52.21 by failing to implement the maximum degree of reduction for each pollutant in its BACT analysis.

**O.      COUNT XV: Improper BACT Analysis for Natural Gas Fired Sources Less than 100 MMBTU/hr.**

197.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

198.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 9(a)(ii) on page 31 of the Notice Letter and the allegations of that page are incorporated herein *in extenso* as fully as if retyped herein verbatim.

199. BRS did not provide an economic analysis to support its BACT analysis. Step 2 of BRS's PM BACT analysis for natural gas fired sources less than 100 MMBTU/hr states that the use of baghouses are technically infeasible because the low particulate loading of the exhaust would not make the baghouse cost effective.

200. This statement must be supported by an economic analysis that calculates the average and incremental cost effectiveness in dollars per ton of pollutant removed. This economic analysis was not provided in Application, Rev. 2.

201. Upon information and belief, BRS violated 40 C.F.R. § 52.21 by improperly conducting its BACT analysis for natural gas fired sources less than 100 MMBTU/hr, thereby failing to implement the maximum degree of reduction for each pollutant.

     **P.**     **COUNT XVI: Improper SO$_2$ BACT Analysis for the EAF.**

202. The allegations in all of the preceding paragraphs are incorporated herein by reference.

203. The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 9(a)(ii) on page 31 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

204. BRS did not provide an economic or environmental analysis to justify the elimination of wet scrubbing as SO$_2$ BACT.

205. Upon information and belief, BRS violated 40 C.F.R. § 52.21 by failing to provide an economic or environmental analysis to justify the elimination of wet scrubbing as SO$_2$ BACT, thereby failing to implement the maximum degree of reduction for each pollutant.

Q.     **COUNT XVII: Improper Greenhouse Gas ("GHG") BACT Analysis.**

206.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

207.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 9(a)(iii) on pages 31 through 32 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

208.    BRS did not properly justify the elimination of the scrap preheating from GHG BACT under Step 2 of the top-down BACT analysis.

209.    None of the reasons given by BRS for its elimination described why this technology was technically infeasible. Environmental and economic factors are not considered in Step 2 of the top-down BACT analysis.

210.    Upon information and belief, BRS violated 40 C.F.R. § 52.21 by failing to justify the elimination of the scrap preheating from GHG BACT under Step 2 of the top-down BACT analysis, thereby failing to implement the maximum degree of reduction for each pollutant.

R.     **COUNT XVIII: Improper BACT Analysis of Fugitive Emissions.**

211.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

212.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 9(a)(iv) on pages 32 through 33 of the Notice Letter and the

allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

213.    BRS's BACT analysis for fugitive emissions is not valid and the fugitive emissions are severely underestimated.

214.    The BACT analysis for Source SN-80 (Charge Crane) in Application, Rev. 2 is improper. No control options were eliminated due to technical infeasibility or economic, energy, and environmental reasons. Yet, the least efficient control option was selected as BACT.

215.    Upon information and belief, BRS violated 40 C.F.R. § 52.21 by conducting an improper BACT analysis for Source SN-80, thereby failing to implement the maximum degree of reduction for each pollutant and by failing to demonstrate that the controls have the maximum degree of reduction.

**S.        COUNT XIX: Unsupportable BACT Limit for $CO_2$e.**

216.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

217.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Sections 9(a)(v) and 9(a)(vii) on page 33 and Section 9(b) on pages 35 through 36 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

218.    BRS used an unsupportable BACT limit for $CO_2$e.

219.    By establishing a GHG BACT limit "representing one potential product mix" (the highest emitting product mix), the Permit fails to meet the statutory definition of BACT for "all operating conditions" which will undoubtedly include lower emitting product mixes.

220.    $CO_2e$ BACT limits in the BRS Permit are not appropriate because they are energy input based, instead of product output based.

221.    In BRS's Application, Rev. 2, and in the Draft Permit, the BACT limit for $CO_2e$ was established by BRS, and accepted by ADEQ, as 0.0723 tons of $CO_2e$ per ton of steel produced.  However, upon review of the Draft Permit, BRS stated in the comments to its Draft Permit that it should "be adjusted to reflect a worst case production output."

222.    In its response to BRS's comments, ADEQ doubled the $CO_2e$ BACT limit to 0.155 tons $CO_2e$/ton of liquid steel produced.  This is error and fails to satisfy GHG BACT. There was no technical explanation or supporting document available to the public for such a significant change.

223.    Using the "worst case" scenario for higher carbon steel product mixes is inappropriate, by BRS's own admission in the Application, Rev. 2, for product mixes based on its production of the average or lower carbon steel products.

224.    The use of this "worst case" GHG BACT limit is contrary to the statutory definition of BACT. CAA § 169(3), 42 U.S.C. § 7479(3); 40 C.F.R. § 52.21(b)(12).  That is, the 0.155 limit is twice the original "average" expectation and is not "an emission limitation based on the maximum degree of reduction….which the permitting authority…determines is achievable" during times when lower carbon content steel products are manufactured.

225.    BRS is required to evaluate the emissions levels that are achievable under all operating conditions expected during the facility's service life, not just those representing one potential product mix or permitted fuel source.

226.    The average $CO_2e$ emissions are lower than the worst case emission.

227.    By establishing a GHG BACT limit "representing one potential product mix" (the highest emitting product mix), the Permit fails to meet the statutory definition of BACT for "all operating conditions" which will undoubtedly include lower emitting product mixes.

228.    The improper BACT limit also constitutes the use of incorrect emissions data and violates the data completeness requirements of 40 C.F.R. § 52.21(n) and Appendix W, §8.1.2 and associated subsections, and the obligation for complete and accurate information is also found in Reg. 26.409.

229.    Upon information and belief, BRS violated 40 C.F.R. § 52.21(n), Appendix W, §8.1.2 and associated subsections, and Reg. 26.409 by using an improper BACT limit for $CO_2e$.

230.    BRS should have implemented efficiency standards for all permitted combustion sources at the BRS Facility in order to implement Energy Efficiency Measures on a facility-wide basis in accordance with GHG BACT.

231.    Combustion sources such as furnaces and burners do not have a mandated efficiency, which would be appropriate for any combustion source in order to assure energy efficiency.

232.    Instead, ADEQ mandated a boiler efficiency of 75% for all boilers at BRS as GHG BACT.

233.    Energy Efficiency Measures must be determined as GHG BACT on a facility-wide basis in order to remain consistent with nationwide GHG BACT determinations.

234.    The Permit requires that combustion sources implement energy efficiency measures as BACT.

235.    However, the Permit does not specify exactly what measures must be implemented to be considered stringent enough to constitute BACT.

39

236.    BRS's lack of response to certain energy efficiency measures outlined in EPA's "Available and Emerging Technologies for Reducing Greenhouse Gas Emissions from the Iron and Steel Industry" is not acceptable.

**T.      COUNT XX: Improper VOC BACT Analysis.**

237.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

238.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Sections 9(a)(vi) through 9(a)(vii) on pages 33 through 34 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

239.    Scrap degreasing was improperly eliminated as VOC BACT for EAFs.

240.    BRS's Step 2 analysis did not substantiate the physical, chemical, and engineering principles used to determine that scrap degreasing was technically infeasible.

241.    Additionally, in the VOC BACT analysis for the Annealing and Coating Lines (SN-53), BRS stated that use of a regenerative thermal oxidizer ("RTO") achieving a 95% VOC control efficiency should be considered as VOC BACT.

242.    Neither the BRS BACT analysis nor the Permit notes whether the control efficiency was evaluated as VOC BACT.

243.    Upon information and belief, BRS violated 40 C.F.R. § 52.21 by conducting an improper BACT analysis for VOC, thereby failing to implement the maximum degree of reduction for each pollutant and by failing to demonstrate that the controls have the maximum degree of reduction.

U.    **COUNT XXI: Improper Elimination of Carbon Capture and Sequestration ("CCS") as a Control Technology in GHG BACT.**

244.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

245.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 9(a)(viii) on page 34 of the Notice Letter and the allegations of that page are incorporated herein *in extenso* as fully as if retyped herein verbatim

246.    In its analysis for GHG BACT, BRS eliminated Carbon Capture and Sequestration ("CCS") as a viable control technology in Step 2 of its top-down BACT Analysis, stating that CCS is technically infeasible.

247.    The technical reasons provided in the GHG BACT analysis for eliminating CCS from further consideration do not conform to existing EPA guidance on the issue, do not conform to previous nationwide GHG BACT determinations, and should not be considered when determining the technical feasibility of CCS.

248.    Upon information and belief, BRS violated 40 C.F.R. § 52.21 by eliminating Carbon Capture and Sequestration ("CCS") as a viable control technology in Step 2 of its BACT Analysis for GHG, thereby failing to implement the maximum degree of reduction for each pollutant.

V.    **COUNT XXII: Failure to Provide Proper Dust Control and Scrap Management Plan.**

249.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

41

250.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 9(a)(ix) on page 34 of the Notice Letter and the allegations of that page are incorporated herein *in extenso* as fully as if retyped herein verbatim.

251.    BRS did not define the required work practices for dust control or scrap management at the proposed BRS Facility.

252.    The EAFs and LMFs are required to implement a scrap management plan in order to address $SO_2$, $NO_x$, CO, and VOC BACT.

253.    However, the Permit does not specify what the scrap management plan must contain in order to be considered stringent enough to constitute BACT.

254.    This lack of specificity for the dust control plan and for the scrap management plan results in unreliable emission rates (which affect modeling analysis), but also makes the BACT limits unenforceable.

255.    Upon information and belief, BRS's failure to consider all potential control technologies, especially those that are more stringent than the chosen level of BACT, violates 40 C.F.R. § 52.21 by failing to implement the maximum degree of reduction for the pollutant in question.

### W.    COUNT XXIII: Unachievable and Undemonstrated Emissions Rates and Emissions Factors.

256.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

257.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 10(a) on pages 36 through 38 of the Notice Letter and the

allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

258.   BRS utilized unachievable and undemonstrated emissions rates and emission factors in its PM/PM$_{10}$/PM$_{2.5}$ modeling.

259.   BRS based its PM/PM$_{2.5}$/PM$_{10}$ emissions estimates for emission sources SN-04 – SN-22, SN-26 – SN-29 and SN-39, on what BRS described as an EPA natural gas combustion study from the year 2010, as referenced in a document produced by the Minnesota Pollution Control Agency (the "Minnesota study"), not the EPA AP-42 factors.

260.   In the absence of any update to AP-42 emission factors for natural gas combustion and any policy memo or guidance, using a different emission factor is not appropriate, unless the applicant has specific direct test data or engineering data to support it as applied to the facility proposed to be permitted.

261.   BRS submitted no test data or engineering data to support its use of a non AP-42 emission factor.

262.   Since the PM/PM$_{2.5}$/PM$_{10}$ emission factor used by BRS is not adequately supported by scientific data, there is no basis to expect that these natural gas-fired emissions sources can actually achieve this level of emissions, and thus, BRS has not demonstrated that its emissions will not cause or contribute to a violation of the NAAQS, in violation of 42 U.S.C. §7475(a)(3), and 40 C.F.R. §§51.166(k), 52.21(k)(1), and 52.21(l)(2).

263.   Furthermore, the unapproved test method used in the Minnesota Study is different than the test method specified in the Permit, and thus the Permit does not comply with title V requirements because it fails to contain terms and conditions necessary to enforce compliance with applicable requirements.

264.     Additionally, 42 U.S.C. § 7475(a)(4) requires that the proposed BRS Facility will be outfitted to meet the BACT requirements. By using unproven emissions factors and not the industry accepted EPA AP-42 factors, BRS has failed to demonstrate that it will implement the maximum degree of reduction for each pollutant, in violation of 40 C.F.R. § 52.21. BRS has also violated the data completeness requirements of 40 C.F.R. § 52.21(n) and Appendix W, § 8.1.2 and associated subsections.

X.     **COUNT XXIV: Improper Emissions Factors for EAFs.**

265.     The allegations in all of the preceding paragraphs are incorporated herein by reference.

266.     The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 10(b) on page 38 of the Notice Letter and the allegations of that page are incorporated herein *in extenso* as fully as if retyped herein verbatim.

267.     BRS used improper emissions factors for the EAFs. The $PM_{2.5}$ emission limit specified in the Permit for each EAF is 0.0024 grains per dry standard cubic foot (gr/dscf), which is significantly lower that the currently recognized BACT.

268.     Upon information and belief, BRS's failure to demonstrate that the emission factors for EAFs are achievable violates the PSD rules. BRS has failed to demonstrate the proposed BRS Facility will be outfitted to meet the BACT requirements, in violation of 42 U.S.C. § 7475(a)(4). BRS's use of incorrect emissions data also violates the data completeness requirements of 40 C.F.R. § 52.21(n) and Appendix W, § 8.1.2 and associated subsections. Finally BRS has not demonstrated that its emissions will not cause or contribute to a violation of

the NAAQS, in violation of 42 U.S.C. §7475(a)(3), and 40 C.F.R. §§51.166(k), 52.21(k)(1), and 52.21(l)(2).

**Y.     COUNT XXV: Failing to Inform ADEQ that its Equipment Vendor Would Not Guarantee the PM$_{2.5}$ Emissions from Natural Gas Combustion Equipment when BRS Knew that ADEQ was Relying on Said Guarantees to Demonstrate Achievability.**

269.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

270.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 10(c) on pages 38 through 40 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

271.    BRS attempted to use vendor guarantees to assure ADEQ that it could meet its emission rates, which were significantly lower than the EPA AP-42 rates.

272.    BRS communicated to ADEQ that SMS Siemag, the German manufacturer and supplier of BRS's natural gas combustion equipment, had guaranteed that the equipment could meet these rates.

273.    ADEQ exclusively relied on BRS's statements regarding SMS Siemag's guarantee to determine achievability of the emission rates for BRS's natural gas combustion equipment. SMS Siemag never supplied any written guarantees of the achievability of the very low PM emission rates for the natural gas combustion equipment to BRS.

274.    SMS Siemag indicated that the emission rates were unknown for sources SN-04 – 19, SN-20 – 21, and SN-22, SN-26, SN-27, SN-28, SN-29 and SN-39, and that therefore, SMS Siemag could not guarantee achievability of those emission rates.

45

275.    Upon information and belief, BRS failed to demonstrate that its facility would not cause or contribute to a violation of the NAAQS in violation of 42 U.S.C. § 7475(a)(3) and 40 C.F.R. §§ 51.166(k) and 52.21(k)(1) because BRS's own equipment supplier would not guarantee the low emission rates used by BRS in its modeling demonstration, and because BRS concealed that fact from ADEQ and the public,

**Z.      COUNT XXVI: Failure to Provide Adequate Additional Impacts Analysis or Alternatives Analysis.**

276.    The allegations in all of the preceding paragraphs are incorporated herein by reference.

277.    The facts asserted and allegations contained in the Notice Letter are incorporated herein by reference. Relevant portions of the Notice Letter include, but are not limited to, the allegations contained in Section 11 on pages 41 through 42 of the Notice Letter and the allegations of those pages are incorporated herein *in extenso* as fully as if retyped herein verbatim.

278.    40 C.F.R. § 52.21(o) requires an application to analyze potential impacts resulting from residential, commercial, and industrial growth associated with the proposed facility.

279.    BRS's additional impacts analysis made no mention of associated growth in the area due to increased truck and rail service to the site nor of the associated support industries that will accompany the proposed plant, including the proposed port facility to be constructed by or for the primary benefit of BRS.

280.    APC&EC Reg. 19.904(C)(1) provides: "Where air quality impact analyses required under this part indicate that the issuance of a permit for any major stationary source or for any major modification would result in the consumption of more than fifty percent (50%) of any available annual increment or eighty percent (80%) of any short term increment, the person

applying for such a permit shall submit to the Department an assessment of the following factors: (a) Effects that the proposed consumption would have upon the industrial and economic development within the area of the proposed source; and (b) Alternatives to such consumption, including alternative siting of the proposed source or portions thereof."

281.　　Any new mobile sources brought into the area will consume increment against the PSD increments and will also contribute to an exceedance of the NAAQS limit.

282.　　BRS Application, Rev. 2 made no mention of any alternatives for increment consumption, including alternate sites for the BRS Facility.  BRS's failure to present alternatives to increment consumption is in violation of APC&EC Reg.19.904(C).

283.　　Upon information and belief, BRS violated 40 C.F.R. § 52.21(o) and APC&EC Reg.19.904(C) by failing to include an adequate additional impacts analysis and by failing to present alternatives to increment consumption in its Application Rev. 2.

**AA.　　COUNT XXVII: Failure to Have Federally Enforceable Limits for PM$_{2.5}$.**

284.　　 The allegations in all of the preceding paragraphs are incorporated herein by reference.

285.　　A permit under the CAA must be federally enforceable to be valid.

286.　　To be federally enforceable, a permit must be issued by the EPA, or by a state pursuant to a state implementation plan that has been approved by the EPA.

287.　　A state implementation plan must include provisions "for implementation, maintenance, and enforcement of [NAAQS]" including "enforceable emission limitations . . .  as may be necessary or appropriate to meet the applicable [CAA] requirements." 42 U.S.C. §§ 7410(a)(1) and (a)(2)(A).

288.   The BRS Permit was issued by the ADEQ on September 18, 2013, pursuant to ADEQ's authority under the Arkansas State Implementation Plan. EPA has not issued any PSD permit to BRS for construction of the BRS Facility.

289.   The BRS Permit as issued by ADEQ contains terms and conditions that purport to ensure compliance with the NAAQS for $PM_{2.5}$, and with the PSD increment for $PM_{2.5}$.

290.   At the time the BRS Permit was issued, and as of the filing of this Complaint, the Arkansas SIP had not adopted provisions necessary to issue PSD permits for purposes of compliance with the NAAQS for $PM_{2.5}$ or for the PSD $PM_{2.5}$ increment under the CAA.

291.   ADEQ was required to adopt and submit provisions necessary to issue PSD permits for purposes of compliance with the NAAQS for $PM_{2.5}$ or for the PSD $PM_{2.5}$ increment by July 20, 2012, but failed to do so.

292.   On May 22, 2014, EPA published a notice of the State of Arkansas's failure to adopt provisions necessary to issue permits that comply with PSD requirements for $PM_{2.5}$ under the CAA.  *See*, 79 Fed.Reg. 29354.

293.   The State of Arkansas's SIP has not been approved by EPA for purposes of regulating $PM_{2.5}$ under the CAA PSD program.

294.   As a result, the BRS Permit is not federally enforceable for $PM_{2.5}$ and thus BRS does not have a permit to emit $PM_{2.5}$ as required by the CAA.

295.   As set forth previously, BRS has commenced construction of the BRS Facility. Because BRS does not have a federally enforceable permit for purposes of $PM_{2.5}$ emissions, it may not construct or operate its facility, and the Court can enjoin construction of the BRS Facility, pursuant to 42 U.S.C 7604(a)(3).

## IX.   **PRAYER FOR RELIEF**

THEREFORE, Plaintiffs, Nucor Steel – Arkansas and Nucor-Yamato Steel Company, respectfully request the Court to enter judgment for Plaintiffs and against Big River Steel, LLC, and enter an order:

A.     Enjoining BRS from constructing or continuing to construct its proposed greenfield steel mill facility at 2027 E. State Highway 198, near Osceola, in Mississippi County, Arkansas.

B.     Enjoining BRS from conducting operations at 2027 E. State Highway 198, near Osceola, in Mississippi County, Arkansas.

C.     Revoking BRS's Permit.

D.     Requiring BRS, should it continue to desire to build its facility in Mississippi County, to submit an application to ADEQ which complies with the requirements of the CAA, 42 U.S.C. §§7401, et seq., and Arkansas law, including, but not limited to the Arkansas Water and Air Pollution Control Act, Ark. Code Ann. §8-4-101, et seq., and administrative procedures and substantive rules of the APC&EC, including Regulation 8, the Arkansas State Implementation Plan (Reg. 19), the Arkansas Operating Permit Program (Reg. 26), and National Ambient Air Quality Standards (40 CFR Part 50); the rules regarding Prevention of Significant Deterioration (40 CFR Section 52.21); and the rules regarding title V Operating Permits (40 CFR Part 70).

E.     Assessing civil penalties against BRS pursuant to 42 U.S.C. §7604.

F.     Awarding reasonable attorney fees and expert witness fees under 42 U.S.C. §7604.

G.    For all other just and equitable relief for Nucor Steel – Arkansas and Nucor-Yamato Steel Company.

Respectfully submitted,

DOVER DIXON HORNE, PLLC

By:_____

Mark H. Allison (AR #85001)
Michael G. Smith (AR #81146)
William C. Bird III (AR #2005149)

425 West Capitol Avenue, Suite 3700
Little Rock, Arkansas 72201
Phone:  (501) 375-9151
Fax:  (501) 375-6484
Email: mallison@ddh-ar.com
Email: msmith@ddh-ar.com
Email: bbird@ddh-ar.com

And

David R. Taggart (TX #00793102)
Jerald N. Jones (LA #2005)
BRADLEY MURCHISON KELLY & SHEA LLC
401 Edward Street, Suite 1000
Shreveport, LA  71101-5529
Phone: (318) 227-1131
Fax:   (318) 227-1141
Email: dtaggart@bradleyfirm.com
Email: jjones@bradleyfirm.com

Attorneys for Nucor Steel-Arkansas and
Nucor-Yamato Steel Company

**EXHIBIT 1 –**

**NOTICE LETTER DATED MAY 30, 2014**



BRADLEYFIRM.COM

David R. Taggart
*Partner*
Shreveport Office
direct: (318) 934-4014
dtaggart@bradleyfirm.com

SHREVEPORT | NEW ORLEANS | BATON ROUGE

May 30, 2014

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**
Mr. John Correnti
Big River Steel, LLC
1425 Ohlendorf Road
Osceola, AR 72370

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**
Honorable Teresa Marks, Director
Arkansas Department of Environmental Quality
5301 Northshore Drive
North Little Rock, AR 72118-5317

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**
Honorable Gina McCarthy, Administrator
United States Environmental Protection Agency
U.S. EPA Headquarters
Ariel Rios Building
1200 Pennsylvania Avenue N.W.
Mail Code 1101 A
Washington, D.C. 20460

Re:   Notice of Violations and Intent to File Citizen Suit against Big River Steel, LLC
      Under Section 304 of the Clean Air Act, 42 U.S.C. § 7604.

Dear Ladies and Gentleman:

Nucor Steel – Arkansas, a division of Nucor Corporation, and Nucor-Yamato Steel Company (collectively "Nucor") provide Big River Steel, LLC ("BRS"), the Arkansas Department of Environmental Quality ("ADEQ") and the United States Environmental Protection Agency ("EPA") with this notice of violations of the Clean Air Act ("CAA") (42 U.S.C. §§ 7604, 7475, 7661c); National Ambient Air Quality Standards (40 C.F.R. Part 50); the rules regarding Prevention of Significant Deterioration ("PSD") (40 C.F.R. § 52.21); and the rules regarding Title V Operating Permits (40 C.F.R. Part 70), all of which are part of the federally approved Arkansas State Implementation Plan ("SIP"), as well as the Arkansas Water and Air Pollution Control Act, Ark. Code Ann. § 8-4-101, *et seq.*, and administrative procedures and substantive rules of the Arkansas Pollution Control & Ecology Commission ("APC&EC"),

EXHIBIT
1

Edwards Street, Suite 1000 | Shreveport, Louisiana 71101 | T (318) 227-1131 | F (318) 227-1141

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 2

including Administrative Procedures (Regulation 8), the Arkansas State Implementation Plan (Regulation 19), and the Arkansas Operating Permit Program (Regulation 26).

Nucor intends to file a citizen enforcement suit under Section 304 of the CAA for these violations. Section 304 of the CAA authorizes:

[A]ny person [to] commence a civil action on his own behalf against any person ... who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

42 U.S.C. § 7604(a)(1). Section 304 of the CAA also authorizes suit against

[a]ny person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality . . . or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

42 U.S.C. § 7604(a)(3).

The CAA defines "emission standard or limitation" as:

(1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard ... or (4) any other standard, limitation, or schedule established under any permit listed pursuant to subchapter V of this chapter or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations.

42 U.S.C. § 7604(f).

**Persons Giving Notice:**

Nucor Steel – Arkansas
Nucor Corporation
Nucor-Yamato Steel Company

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 3

>       Nucor Steel – Arkansas
>       7301 East CR 142
>       Blytheville, Arkansas 72315
>
>       Nucor Corporation
>       1915 Rexford Road
>       Charlotte, North Carolina 28211
>
>       Nucor-Yamato Steel Company
>       5929 Arkansas 18
>       Blytheville, Arkansas 72315

**Nucor's Counsel:**

>       Mr. David R. Taggart
>       Bradley Murchison Kelly & Shea LLC
>       401 Edwards Street, Suite 1000
>       Shreveport, Louisiana 71101
>       Phone: (318) 227-1131
>       Fax:    (318) 227-1141
>
>       Mr. Mark H. Allison
>       Dover Dixon Horne, PLLC
>       425 West Capitol Avenue, Suite 3700
>       Little Rock, Arkansas 72201
>       Phone: (501) 375-9151
>       Fax:    (501) 375-6484

**Person Responsible for Alleged Violations:**

BRS is responsible for violations of the CAA (42 U.S.C. §§ 7604, 7475, 7661c); National Ambient Air Quality Standards (40 C.F.R. Part 50); the rules regarding PSD (40 C.F.R. § 52.21); and the rules regarding Title V Operating Permits (40 C.F.R. Part 70), all of which are part of the federally approved Arkansas SIP, as well as Arkansas Water and Air Pollution Control Act, Ark. Code Ann. § 8-4-101, *et seq.*, and administrative procedures and substantive rules of the APC&EC, including its Administrative Procedures (Regulation 8), the Arkansas State Implementation Plan (Regulation 19), and the Arkansas Operating Permit Program (Regulation 26).

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 4

**Nucor's Interest in this Matter**

This notice describes violations that have caused Nucor to suffer an injury-in-fact – specifically, an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. This injury is "particularized" because it affects Nucor in a personal and individual way. Further, Nucor asserts that there is a causal connection between the injuries alleged herein and the conduct complained of – in other words, the injury is fairly traceable to the challenged action of BRS, and not the result of the independent action of some third party not the subject of this dispute. Finally, Nucor asserts that it is likely, as opposed to merely speculative, that its injury will be redressed by a favorable decision from the courts, if indeed Nucor is forced to eventually seek relief from the courts.

This notice describes violations that present a danger to the public health or safety of Nucor and its employees and contractors and to the environment and which adversely affect Nucor. The Nucor mills both are located in the same CAA Air Quality Control Region ("AQCR") as the BRS Facility, i.e., AQCR 20, the Northeast Arkansas Intrastate Air Quality Control Region. *See* 40 C.F.R. § 81.139. The Nucor mills also are located in the same county and approximately 20 miles northeast of the site of the proposed BRS Facility. The wind blows most often from the site of the proposed BRS Facility in the direction of the Nucor mills. Numerous businesses that support the Nucor mills also are located in the Northeast Arkansas Intrastate Air Quality Control Region and in Mississippi County, and operate under air permits issued by the ADEQ. Emissions of air pollutants from the BRS Facility will impact the air quality in Mississippi County, including at Nucor's mills and ancillary facilities located in Mississippi County, Arkansas. The interests of Nucor will be adversely affected by pollution from the BRS Facility because the level of pollutants to be discharged from the BRS Facility will degrade air quality, injuring and/or damaging wildlife, vegetation, water quality, and real estate in property owned by Nucor and/or used by Nucor employees. The BRS Facility emissions will negatively impact Nucor's employees' health and productivity, which impacts the operations at Nucor's facilities. As such, BRS's actions and the violations alleged in this letter injure both Nucor and its employees. These injuries are actual, concrete and irreparable. Consequently, Nucor has an interest in air quality in Mississippi County, Arkansas and in the Northeast Arkansas Intrastate Air Quality Control Region and in permits issued by ADEQ that affect such air quality and that affect the attainment status of Mississippi County under the CAA.

Additionally, the construction and operation of the BRS Facility near Osceola will result in an exceedance of the National Ambient Air Quality Standard ("NAAQS") and consumption of the PSD increment for particulate matter, at least for $PM_{2.5}$. Exceedance of the NAAQS and PSD increment consumption in the AQCR or Mississippi County will result in the AQCR or the county being reclassified as "nonattainment." Once the AQCR or county is classified as nonattainment, Nucor is immediately burdened by additional regulatory requirements, including

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 5

potentially the requirement to "offset" any additional emissions.  Further, the ADEQ must develop a SIP to restore attainment of the NAAQS, which will add to the costs of future expansions or modifications of the Nucor mills or of Nucor's support facilities and customers located in Mississippi County.  The SIP is required to include control measures reducing emissions of the pollutant, $PM_{2.5}$, and its precursors, $NO_x$ and $SO_2$, to a level necessary to achieve the NAAQS.  Because the area would be in nonattainment, the SIP will require reductions in $PM_{2.5}$ direct emissions, $NO_x$ emissions and $SO_2$ emissions sufficient to demonstrate attainment of the NAAQS under design conditions (e.g., representative worst case as defined by EPA guidance).

As other major sources of $PM_{2.5}$, $NO_x$ and $SO_2$, the Nucor facilities will foreseeably be asked to reduce emissions from their electric arc furnaces, ladle metallurgy furnaces, tunnel furnaces, reheat furnaces, miscellaneous natural gas combustion operations (boilers, ladle preheaters and dryers, tundish preheaters and dryers, holding stations, etc.) and cold mill operations (annealing furnaces, galvanizing lines, and pickling operations) to offset the wrongful emissions increases from the BRS Facility.  The purpose of the PSD modeling is to ensure that the addition of a new source, such as BRS, does not cause or contribute to the AQCR or Mississippi County going into nonattainment so that the public and existing sources do not suffer adverse air and economic consequences of development in contravention of the CAA's requirements.

Furthermore, BRS's permitted best available control technology ("BACT") limits for $PM_{2.5}$ for natural gas combustion sources and electric arc furnaces are far below other steel mills and have not been demonstrated to be achievable.  Establishment of BACT limits for $PM_{2.5}$ for natural gas combustion sources and electric arc furnaces based on emission factors and limits that have not been demonstrated to be achievable will injure Nucor because it will add to the cost of expansions or modifications of the Nucor mills or of Nucor's support facilities and customers located in Mississippi County.

All combustion activities at the Nucor facilities, including without limitation, electric arc furnaces, ladle metallurgy furnaces, tunnel furnaces, reheat furnaces, miscellaneous natural gas combustion operations (boilers, ladle preheaters and dryers, tundish preheaters and dryers, holding stations, etc.) and cold mill operations (annealing furnaces, galvanizing lines, and pickling operations), will thus be impacted by construction and/or operation of the BRS Facility.  All future combustion activities at the Nucor facilities, and by surrounding facilities that purchase product from or that support the Nucor facilities, will be impacted by construction and/or operation of the BRS Facility. All current and future material handling operations, to the extent that they generate $PM_{2.5}$, whether from the Nucor facilities or from surrounding facilities that purchase product from or that support the Nucor facilities, will be impacted by construction and/or operation of the BRS Facility.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 6

Additionally, BRS has failed to consider the impact of secondary formation of $PM_{2.5}$ from the BRS Facility or from growth associated with the BRS Facility, either near the BRS Facility or distant from the BRS Facility. Modeling submitted by BRS demonstrated air quality impacts just below the $PM_{2.5}$ NAAQS. Modeling of the actual permit limits for the BRS Facility demonstrates that allowable emissions exceed the $PM_{2.5}$ NAAQS. In its modeling and air quality analysis demonstration, BRS failed to consider the impact of secondary formation of $PM_{2.5}$ from the BRS Facility contrary to the CAA. BRS also failed to consider the impact of secondary formation of $PM_{2.5}$ from growth associated with the construction and operation of the BRS Facility. Distant impacts from the secondary formation of $PM_{2.5}$ from emissions of $PM_{2.5}$ precursors from the BRS Facility affect Nucor and the health and safety of Nucor's employees and contractors to the extent such impacts result in an exceedance of the NAAQS at or near the Nucor facilities in Mississippi County, Arkansas.

## Procedural History:

On January 30, 2013, BRS filed its first air permit application for the BRS Facility with ADEQ. The application related to a proposal by BRS to build and operate a new greenfield steel mill to be located at 2027 E. State Highway 198, near Osceola, in Mississippi County, Arkansas. Because the January 30, 2013, air permit application was incomplete, confusing, erroneous, and contradictory, ADEQ required BRS to resubmit the air permit application. On March 5, 2013, BRS filed its first revision to the original air permit application, including an analysis of projected air quality impacts from the BRS Facility. The application, as revised, was deemed administratively complete by ADEQ on March 14, 2013, and notice of receipt of the application was published on or about March 18, 2013.

Due to errors, design and calculation changes, and ongoing and confusing supplementary information submitted to ADEQ by BRS, and in order to provide notice of the application to the public and other interested persons, ADEQ required BRS to submit another complete revised air permit application. This revised application was dated June 21, 2013, and was received by ADEQ, in part, via email on June 21, 2013, and the paper copy was received by ADEQ on Monday June 24, 2013 ("Application, Rev. 2"). No public notice of the filing of Application, Rev. 2 was provided by ADEQ or BRS. One day after receipt of Application, Rev.2 by ADEQ, on June 25, 2013, ADEQ issued a draft permit for the BRS Facility ("Draft Permit") and an accompanying Statement of Basis ("SOB"). Notice of the Draft Permit was published on June 27, 2013.

ADEQ provided a public comment period on the Draft Permit from June 27, 2013 through July 30, 2013. On July 30, 2013, ADEQ held a combined public meeting and public hearing on the Draft Permit in Osceola, Arkansas. During the public comment period, written comments were submitted on the Draft Permit by BRS, Nucor, the EPA, and the Federal Land Manager for the Mingo Wilderness ("FLM"). Nucor timely submitted its comments dated July

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 7

29, 2013. ADEQ issued the Final Permit to BRS on September 18, 2013 (Operating Air Permit No. 2305-AOP-R0) ("Permit"). This Permit was the first PSD permit issued by ADEQ containing emission limits for $PM_{2.5}$ and the first ADEQ permit since the $PM_{2.5}$ PSD regulations and guidance were updated to explicitly require consideration of precursor emissions as part of the required air quality analyses and demonstrations.

Nucor timely submitted its Third Party Request for Commission Review and Adjudicatory Hearing on October 17, 2013, as required by Ark. Code Ann. § 8-1-203 and APC&EC Reg. 8.603(B), styled as In the Matter of: Big River Steel, LLC, Permit No. 2305-AOP-R0, APC&EC Docket No. 12-006-P. During the discovery process, the parties produced over 200,000 pages of documents and records and took a number of depositions of ADEQ staff and BRS employees and consultants. An evidentiary hearing on the merits commenced on February 18, 2014 and continued through February 21, 2014 before an Administrative Hearing Officer ("AHO"). On March 20, 2014, the AHO issued his Recommended Decision, suggesting that the BRS Permit is valid. On April 2, 2014, Nucor filed its Request for Oral Argument with the APC&EC. Oral argument before the APC&EC occurred on April 25, 2014. Thereafter, the Commission announced that it was fully adopting the AHO's Recommended Decision. Nucor has exhausted its administrative remedies as required by law.

Pursuant to Section 304 of the CAA, 42 U.S.C. § 7604(b)(1)(A), Nucor hereby provides 60 days prior notice of violations and intent to file a citizen suit for a violation of an air standard to the Administrator of the EPA, the State, and BRS, the alleged violator of the standard.

### Description of Big River Steel LLC's Clean Air Act Violations:

**1.     Because use of background $PM_{2.5}$ values from all in-state regional $PM_{2.5}$ monitors show the proposed BRS Facility will result in exceedances of the $PM_{2.5}$ NAAQS, BRS failed to conduct adequate pre-construction monitoring as required by Section 165 of the CAA.**

Under the circumstances of this case, where use of $PM_{2.5}$ values from every existing Arkansas monitor shows an exceedance of the $PM_{2.5}$ NAAQS as a result of construction and operation of the BRS Facility, it was incumbent on BRS to actually ascertain the background concentration at the proposed BRS Facility site. Post-construction monitoring is an illegal substitute for the pre-construction monitoring requirement under Section 165(e). 42 U.S.C. § 7475(e)(2) explicitly states that one purpose of the monitoring requirement is to determine whether emissions from a proposed source or modification will exceed the increments or the NAAQS. *See Sierra Club v. EPA*, 705 F.3d 458, 468 (D.C. Cir. 2013). Prior to the D.C. Court of Appeals' decision in *Sierra Club*, the EPA used the Significant Monitoring Concentration ("SMC") to excuse pre-construction monitoring. *See* 45 Fed. Reg. 52,710 (Aug. 7, 1980). The SMC is a modeling screening tool that was used to determine if a source must submit to the permitting authority one year of pre-construction air quality monitoring data prior to constructing

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 8

or modifying a facility.[1] If a proposed source's screening modeling predicted impact is less than the SMC, the source's impact was considered *de minimis* for monitoring purposes, and the reviewing authority could exempt the applicant from the preconstruction monitoring requirement. The reviewing authority could also exempt the applicant from the monitoring requirement if the existing air quality in the area was shown to be less than the SMC. *Id.* However, pursuant to the Court of Appeals' decision in *Sierra Club*, such discretion was, and is, no longer permissible and the "extremely rigid" standard of pre-construction monitoring cannot be waived.

As the *Sierra Club* court explained, if an area's pre-existing ambient $PM_{2.5}$ concentration is so high that a violation of the NAAQS or increment is imminent, a source below the SMC may nevertheless cause a violation if built or modified. *Sierra Club*, 705 F.3d at 468. This is true even if the source's projected ambient impact on $PM_{2.5}$ is so low that the difference in air quality before and after construction would be impossible to measure with accuracy. A permitting authority, like ADEQ, cannot know how close an area is to violating the NAAQS or increment unless it knows the existing ambient concentrations of $PM_{2.5}$ before a source is constructed or modified. *Id.*

BRS failed to conduct site-specific pre-construction monitoring of $PM_{2.5}$ and $PM_{10}$ emissions[2] and rather relied (with ADEQ's support) on site-specific post-construction monitoring. Pre-construction monitoring should have been required because: a) all other existing monitors were over 40 kilometers from the proposed site; b) both $PM_{10}$ and $PM_{2.5}$ impacts due to the proposed facility were greater than their respective SMCs (prior to the SMCs being vacated by the *Sierra Club* decision); and c) the modeling performed for the new source and all existing regional sources was at or just below the NAAQS for $PM_{2.5}$ annual average, making the consideration of actual ambient air quality in the area an important consideration.

Assessing air quality at the BRS site through post-construction monitoring is in direct conflict with 42 U.S.C. § 7475(e) and the basic premise of PSD being a pre-construction permit program. Because PSD is a pre-construction program, post-construction monitoring as an alternative to requiring one year of pre-construction, continuous air quality monitoring, full and complete BACT analysis and a demonstration of both applicability and achievability of the proposed emission rates violates federal PSD requirements. Under the circumstances of this case, because the $PM_{2.5}$ background values recorded by Arkansas monitors combined with the modeled impacts of the proposed BRS Facility exceeded the $PM_{2.5}$ NAAQS, by failing to conduct site-specific pre-construction monitoring, BRS has failed to comply with the requirements of 42

---

[1] EPA Fact Memorandum, September 29, 2010. *Prevention of Significant Deterioration for Fine Particle Pollution – Final Rule to Establish Increments, Significant Impact Levels and a Significant Monitoring Concentration.*
[2] BRS also failed to conduct pre-construction site-specific monitoring for other criteria pollutants, including $NO_2$, $SO_2$ and ozone.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 9

U.S.C. § 7475(e) and has failed to demonstrate that it will not cause or contribute to a violation of the NAAQS which violates federal PSD rules and applicable jurisprudence. The Permit must be vacated.

**2.    BRS failed to properly assess the receptor grid.**

**a.    BRS's modeling inappropriately excluded areas based solely on being below the PM$_{2.5}$ significant impact level ("SIL") after those SILs were vacated.**

Section 165(a) of the CAA, 42 U.S.C. § 7475, requires a person seeking a PSD permit to demonstrate that "emissions from construction or operation of such facility will not cause or contribute to ... air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year [and] (B) national ambient quality standard in any air quality control region ..." 40 U.S.C. § 7475(a)(3). Section 165(e)(1) requires as part of the demonstration "an analysis of the ambient air quality at the proposed site and in areas which may be affected by emissions for each pollutant subject to regulations under this chapter which will be emitted from such facility." 42 U.S.C. § 7475(e)(1).

To put this into effect, the regulations require an applicant (in this case BRS) to demonstrate, for each pollutant emitted from the proposed source that is subject to the PSD requirement, that the allowable emissions from the proposed source, combined with other applicable emissions increases and reductions in the relevant geographic area, plus the background concentration in the relevant geographic area, will not cause or contribute to air pollution that will exceed the "maximum allowable increase" of each pollutant or result in a violation of the NAAQS for such pollutants. 40 C.F.R. §§ 51.166(k) and 52.21(k). As discussed above, as part of the air quality analysis required for PSD permit applications, Section 165(e)(2) requires that a permit applicant gather continuous air quality monitoring data for a period of one year prior to the submittal of a PSD permit application. 42 U.S.C. § 7475(e)(2). Where a permit incorporates the requirements of the PSD program, the permit must fully comply with PSD requirements. *See In the Matter of Wisconsin Power & Light Columbia Generating Station*, Permit No. 111003090-P20; Petition Number V-2008-1 (Oct. 8, 2009), at 8. BRS has failed to make this demonstration in a number of instances, described in greater detail below.

EPA adopted the SIL value of 0.3 μg/m$^3$ for PM$_{2.5}$ on October 20, 2010. 75 Fed. Reg. 64864 (Oct. 20, 2010). Separate standards were adopted for the annual and 24-hour PM$_{2.5}$ NAAQS. EPA stated that if a permit applicant demonstrates that the air quality impact from the new source or modification alone is below the SILs set forth in the regulation, the applicant will be deemed to have satisfied its obligation to demonstrate that emissions from the new source or modification, in combination with other applicable emissions increases or

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 10

reductions, would not cause or contribute to a violation of the $PM_{2.5}$ NAAQS or exceed the $PM_{2.5}$ increment. 40 C.F.R. §§ 51.166(k)(2) and 52.21(k)(2).[3]

In *Sierra Club, supra*, the Sierra Club challenged the adoption of the SILs for $PM_{2.5}$ on the ground that Section 165 of the CAA does not allow EPA to establish a *de minimis* exemption from the requirement that an applicant demonstrate that its proposed emissions would not cause or contribute to a violation of the $PM_{2.5}$ NAAQS or an exceedance of the $PM_{2.5}$ increments. The Sierra Club further argued that even if Section 165 "were not so extraordinarily rigid as to bar any *de minimis* exemption ... pollution increases below the SILs are not so trivial as to be *de minimis*." *Id.* at 463. Among other examples, the Sierra Club argued that in areas in which the ambient air concentration of $PM_{2.5}$ is just meeting the NAAQS, the construction of a source of $PM_{2.5}$ emissions whose modeled impact is below the SIL may still cause a violation of the NAAQS. *Id.*[4] Following the proceedings, the Court vacated and remanded the $PM_{2.5}$ SILs regulations codified at 40 C.F.R. §§ 51.166(k)(2) and 52.21(k)(2).[5] *Id.* at 466. Thus, because the $PM_{2.5}$ SILs had been vacated by the date on which the BRS permit application was deemed administratively complete, the former $PM_{2.5}$ SILs have no applicability to the modeling required for the BRS Permit. To the extent that BRS and/or ADEQ relied upon the SIL after January 22, 2013, that reliance was misplaced and renders issuance of the permit "arbitrary and capricious" and "contrary to law" because the rationale for the permit relied upon a false premise and the permit application "did not consider" an "important factor" that Congress intended the agency to consider.

Despite the *Sierra Club* court's ruling vacating the $PM_{2.5}$ SILs and the fact that no SILs for $PM_{2.5}$ were subsequently promulgated by EPA, BRS used the $PM_{2.5}$ SIL to exclude certain areas from modeling. BRS conducted its modeling using only receptor points that fell within the $PM_{2.5}$ Significant Impact Area ("SIA") as defined by the SIL. The SIA was generally only a few kilometers from the BRS fence line, as opposed to the originally considered grid described in BRS's permit application as extending out 5, 10, or more kilometers from the fence line. Prior to *Sierra Club*, this approach would have been valid since the EPA would have only required BRS to model the receptors which exceeded the SIL value of 0.3 $\mu g/m^3$. Other receptors were

---

[3] EPA's PSD regulations also provide that a regulatory authority may exempt a proposed stationary source or modification from the pre-construction monitoring requirement for a particular pollutant if the emissions increase from the new source or net emissions increase from the modification would cause an ambient air quality impact less than *de minimis* amounts established in the regulations. 40 C.F.R. §§ 51.166 (i)(5)(i) and 52.21(i)(5)(i). The 2010 rule added a SMC or $PM_{2.5}$. 75 Fed. Reg. 64864 (Oct. 20, 2010). This SMC also was vacated in the *Sierra Club* case discussed herein.

[4] In the instant case, the BRS Facility modeling (though flawed in substantial respects as set forth below) barely demonstrates a non-exceedance of the $PM_{2.5}$ annual NAAQS with a modeled concentration, albeit flawed, of 11.91 $\mu g/m^3$.

[5] On December 9, 2013 EPA promulgated a final rule removing the $PM_{2.5}$ SILs and SMC provisions from the PSD regulations in the C.F.R.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 11

exempted from modeling by BRS allegedly because the EPA would have deemed them insignificant, regardless of whether, when added together, they might combine to cause a violation of the NAAQS. The ruling by the D.C. Circuit eliminated the ability to make such exemptions from the modeling when attempting to make the required PSD compliance demonstration. The *Sierra Club* case was decided in January 2013 and was thus applicable at the time the BRS permit application was deemed administratively complete in March 2013. Thus, BRS could not legally exclude individual receptors from modeling merely because the modeled impacts at those receptors fell below 0.3 $\mu g/m^3$. Yet, this is precisely what BRS did and the BRS Permit is based on this faulty and incomplete modeling.

The failure to model these areas has substantial implications. By exempting all receptors which had values less than the vacated SIL value, the model underrepresented the area of significant impact. The failure to model these areas also meant that the modeling could fail to discover a violation of the $PM_{2.5}$ NAAQS. The $PM_{2.5}$ cumulative impact for the BRS Facility, as modeled by BRS, is already at 11.91 $\mu g/m^3$ – just below the 12.00 $\mu g/m^3$ NAAQS limit – and that does not take into account the numerous omissions and flaws within the BRS model inputs (discussed below). Given that the modeled $PM_{2.5}$ cumulative impact for the BRS Facility is already near the NAAQS limit, analyzing these non-exempt areas for the cumulative total could result in an exceedance of the NAAQS. Accordingly, BRS has failed to demonstrate that it will not cause or contribute to a violation of the NAAQS as is required under the law. 40 C.F.R. §§ 51.166(k)(2) and 52.21(k)(2). The Permit must be vacated.

    b.  **BRS failed to include boundary receptors on the public road between the BRS property and the Viskase facility, as well as around the Viskase and Bunge facilities.**

The CAA requires that the NAAQS must be met in all areas of "ambient air," which is defined as "that portion of the atmosphere, external to buildings, to which the general public has access." 40 C.F.R. § 50.1(e). A public road, to which any member of the public has access, clearly falls within the definition of "ambient air." Despite this public access, BRS failed to include properly spaced and located boundary receptors along County Road 198 which traverses the transportation corridor on the south side of the Bunge facility and the north side of the Viskase and proposed BRS Facility, even though this roadway is located between two major industrial facilities. BRS also failed to include boundary receptors around the Viskase facility adjacent to the proposed BRS Facility and around the Bunge facility just north of the proposed BRS Facility. The *Guideline on Air Quality Models* notes that receptor sites "should be utilized in sufficient detail to estimate the highest concentrations and possible violations of a NAAQS or a PSD increment. In designing a receptor network, the emphasis should be placed on receptor resolution and location...." 40 C.F.R. Part 51, App. W, ¶ 7.2.2(a). Where no receptors are included on a roadway, there is inadequate resolution to determine whether the NAAQS or increment may have been violated in that location. Thus, the BRS modeling is flawed because it did not use an appropriate number of receptors located along the roadway and therefore fails to

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 12

demonstrate that the BRS Facility will cause or contribute to a violation of the NAAQS or the PSD increments.

This point is underscored in the recent decision in *National Ass'n of Mfrs. v. EPA*, No. 13-1069, 13-1071, 2014 WL 1851919, — F.3d — (D.C. Cir. May 9, 2014). In that opinion, after citing the definition of ambient air quoted above (*id.* at *4), the D.C. Circuit specifically upheld EPA's decision to require installation of monitors near roads, stating "[t]hat definition [of ambient air] obviously includes near-road areas" and cited with approval EPA's statement that "[i]gnoring monitoring results from [near-road] areas (or not monitoring them at all) would abdicate this responsibility." *Id.* It is unfortunate that BRS and ADEQ chose to similarly "abdicate this responsibility" by excluding the road from their modeling analysis. BRS's failure to explicitly include the road in the model renders the modeled results improper, unreliable and not in accordance with governing law.

Ambient air is defined as "that portion of the atmosphere, external to buildings, to which the general public has access." 40 C.F.R. 50.1(e). As such, modeling must include receptors located along public roadways and along a facility's fence line since this forms the boundary where the public has access. The BRS modeling was inconsistent in including fence line or boundary receptors. Receptors were included around the BRS property itself and around the Plum Point Station to the north for example. However, as explained below, boundary receptors were not included around Viskase or Bunge.

EPA has consistently interpreted the atmosphere inside of a facility's fence line as not qualifying as "ambient air" for purposes of that facility's emissions, i.e. a facility's employees are not considered the general public. However, the atmosphere inside one facility is ambient air in relation to another facility's emissions.[6] When multiple nearby facilities are considered in a modeling analysis (as is the case for the BRS analysis), separate model runs must be completed for each possible combination of ambient air receptors and facility emissions. For example, when considering emissions from Facility A, the receptors inside Facility A would be excluded from the model but receptors inside Facility B would be evaluated, and vice versa. A model run would also be completed for ambient air in common for all facilities involved, i.e. areas that are external to the fence lines of all facilities.

In its modeling of the common ambient air receptors external to all facilities, BRS simply removed receptors from its cartesian receptor grid to create a "hole" in the grid to represent the on-site air of Bunge and Viskase facilities, rather creating a specific set of boundary receptors around those facilities as it did for the BRS Facility and Plum Point facility fence lines. This was

---

[6] *Interpretation of "Ambient Air" In Situations Involving Leased Land Under the Regulations for Prevention of Significant Deterioration (PSD)*, Memorandum from Stephen D. Page, Director US EPA OAQPS, to Regional Air Division Directors, June 22, 2007.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 13

error because the Bunge and Viskase facilities are "ambient air" for purposes of BRS because BRS does not have the authority to exclude the Bunge or Viskase employees from their respective facilities. Proper modeling requires BRS to include receptors within the properties, as well as receptors along the fence line and right of way of the public roads, in order to adequately assess modeled impacts in the ambient air. By ignoring the public road and not including defined receptors at and around Bunge and Viskase, BRS understates the potential ambient air quality impacts from the combination of existing facilities and the proposed BRS Facility. BRS offered no explanation for this deviation from the modeling requirements of *Guideline Air Quality Models* ("Appendix W"), codified as Appendix W of 40 C.F.R. Part 51, other than convenience. 40 C.F.R. § 52.21(l)(1) mandates compliance with Appendix W in air modeling.  As such, the BRS Permit must be vacated.

**3.     BRS used an inappropriate and unrepresentative monitor for background PM$_{2.5}$.**

Federal law requires "the owner or operator of the proposed source … [to] demonstrate that allowable emission increases from the proposed source or modification…would not cause or contribute to air pollution in violation of (1) any national ambient air quality standard in any air quality control region; or (2) any applicable maximum allowable increase over the baseline concentration in any area." 40 C.F.R. § 52.21(k); *see also* 42 U.S.C. § 7475; APC&EC Reg. 19.904(A).[7]  Subsection 52.21(l) requires that modeling shall comply with Appendix W, 40 C.F.R. § 52.21(l)(1).  No variation is allowed unless approval is obtained from the Administrator, not just the director of ADEQ.  *See* 40 C.F.R. § 52.21(l)(2); *see also* APC&E Reg. 19.904(D)(3). No such approval was sought or obtained. While BRS admitted that there are some differences between Arkansas law and Federal law relating to permitting, BRS has stipulated, and both Nucor and ADEQ agreed, that there are no relevant differences between Arkansas and Federal law applicable to the Permit.

Appendix W requires that "the most appropriate data available should always be selected for use in modeling analyses," 40 C.F.R. Part 51, App. W, § 8.0(a), and cautions that "an appropriate data validation procedure should be applied to the data prior to use," 40 C.F.R. Part 51, App. W, § 8.2.1(b).  Appendix W then sets forth recommendations for Isolated Single Sources (§ 8.2.2) and Multi-Source Areas (§ 8.2.3).  BRS is located in a multi-source area because it is located adjacent to the Plum Point Power Plant, a grain elevator (Bunge) and a food processing plant (Viskase).  The Multi-Source Area approach requires modeling of the proposed new sources as well as nearby sources (including adjacent ones) to determine background concentration.  40 C.F.R. Part 51, App. W, § 8.2.3(b).  If there are no monitors "located in the vicinity of the source," then "a 'regional site' may be used to determine background." 40 C.F.R. Part 51, App. W, § 8.2.2(c).  "A 'regional site' is one that is located away from the area of interest

---

[7] APC&EC Reg. 19.904(A) adopts the federal PSD regulations at 40 C.F.R. § 52.21 in effect on November 29, 2005, with minor exceptions not relevant here.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 14

but is impacted by **similar natural and distant man-made sources.**" *Id.* (emphasis added). It is thus clear that the PSD program requires an evaluation of the background concentration to determine its suitability under Appendix W and the Arkansas SIP, each of which contain the same requirement.

BRS used one of the monitors at Dyersburg, Tennessee as its regional monitor for background $PM_{2.5}$. Conveniently, the monitor selected (which contained the lower of the two measured background $PM_{2.5}$ concentrations)[8] measures the lowest concentration of background $PM_{2.5}$ of any monitor within the monitoring network closest to the location of the proposed BRS Facility. The selected Dyersburg monitor measured background $PM_{2.5}$ concentrations of 9.44 $\mu g/m^3$, which, when added to the BRS reported final multisource impact of 2.47 $\mu g/m^3$, brought BRS's proposed facility to a modeled total of 11.91 $\mu g/m^3$ $PM_{2.5}$, barely under the $PM_{2.5}$ NAAQS limit of 12.00 $\mu g/m^3$.[9] Put simply, BRS's selection of an inappropriate background monitor, without any analysis or justification, and which is not representative of the site of the proposed BRS Facility, allowed the avoidance of a modeled violation of the NAAQS.[10] BRS did not supply ADEQ with any documentation or analysis of why the Dyersburg, Tennessee monitor was representative of the BRS Facility site. BRS should have selected the monitor located in Marion, Arkansas, which is not only closer to the proposed BRS Facility but is more representative of Osceola, Arkansas. If BRS had properly used the data from the Marion monitor, BRS's modeling would have demonstrated a violation of the NAAQS for $PM_{2.5}$.

The Dyersburg monitor is not representative of Osceola for a number of reasons. First, Dyersburg is a significant distance from the proposed BRS Facility. Section 2.4.1 of the Ambient Monitoring Guidelines for the Prevention of Significant Deterioration (EPA-450/4-87-007) (May 1987) states that where the proposed source is in an area of multisource emissions and flat terrain, then existing data from a nearby monitor may be used if the monitor is within 10

---

[8] The Dyersburg, Tennessee monitoring site contains two monitors, one reflecting a background concentration of $PM_{2.5}$ of 10.4 $\mu g/m^3$, and the other as 9.44 $\mu g/m^3$. Without explanation, BRS used the lower value as the representative background concentration for $PM_{2.5}$.

[9] Again, Nucor maintains that the modeled value by BRS is incorrect and that, as set forth further in the body of this notice of intent letter, the modeled impact exceeds the $PM_{2.5}$ annual NAAQS.

[10] As the D.C. Circuit recently observed, in setting the form and level of the new $PM_{2.5}$ NAAQS and the manner in which compliance with the standard is to be demonstrated, EPA was concerned with protecting sensitive individuals "living in areas with high particulate matter concentrations," that is, "hotspots," which are inconsistent with EPA's goal of ensuring that the NAAQS provide requisite protection for all individuals. *National Ass'n of Mfrs.*, 2014 WL 1851919, at \*2 (upholding the 2013 $PM_{2.5}$ NAAQS). BRS's use of the lowest available $PM_{2.5}$ value from the Dyersburg monitor as the background value for its NAAQS compliance demonstration, when selection of $PM_{2.5}$ monitored values from any other surrounding $PM_{2.5}$ monitor would result in exceedance of the $PM_{2.5}$ NAAQS, violates the CAA's goal of avoiding "hotspots" and of ensuring that the NAAQS provides "requisite protection for all individuals." BRS should not have used the Dyersburg monitor as background and should have conducted one year of site-specific pre-construction monitoring in order to ensure that all individuals were protected by the NAAQS.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 15

kilometers of the proposed emission sources or within 1 kilometer of the area of maximum concentration from existing sources or the area of combined maximum impact from existing and proposed sources. The Ambient Monitoring Guidelines state that the rationale for this requirement is that modelers "have a reasonable degree of confidence in the modeling results within the 10 kilometers distance," but that even when data exists that meets this criteria, the permit granting authority may decide not to accept such data where there are "uncertainties in the data bases for modeling" and "high estimates of existing air quality resulting in possible threats to the applicable standards." Ambient Monitoring Guidelines, pp. 7-8. Here, the site of the proposed BRS Facility is in a multi-source area as it is adjacent to a coal-fired power plant (Plum Point), a terminal grain elevator (Bunge), and a food products manufacturing facility (Viskase). Despite this, the Permit was based on data from Dyersburg, a monitor that was located almost 65 kilometers away that has little industrial influence.

Additionally, the prevailing wind direction in the area of the proposed BRS Facility is from south southwest to northeast, $i.e.$, the proposed BRS site is downwind and under the influence of $PM_{2.5}$ originating from the Memphis metropolitan area. By choosing the Dyersburg monitor, which resulted in modeling that barely passed the NAAQS, BRS significantly underrepresented the $PM_{2.5}$ influence from the Memphis metropolitan area. It cannot be genuinely disputed that one of the criteria for selecting a "representative" regional monitor is that the monitor selected be impacted by "similar natural and distant man-made sources." No evidence was presented that the Dyersburg monitor met this criteria. In fact, the permit record is devoid of any analysis of the appropriateness of using Dyersburg.[11]

The Marion, Arkansas monitoring site (Site No. 05-035-0005) on the other hand is representative of the proposed BRS Facility and should have been used by BRS. The criteria for selection of a representative monitor should be based on proximity to the proposed site, similar climate and land use regimes, wind flow patterns identifying influencing regional and local sources on existing monitors, and the type of monitoring objective for each monitor site. These factors require the selection of the Marion monitor. When considering the distances monitors are located from the proposed site, the closest site with ambient $PM_{2.5}$ monitoring data is in Marion at about 55 kilometers from the proposed site. The proposed BRS Facility site is characterized by a small nearby town, farmland, and a few nearby industrial sources. Likewise, the Marion monitor is characterized by a residential neighborhood and school with few nearby industrial sources, by the confluence of a number of roadway and train centers (mobile sources), and by its

---

[11] Further, the BRS air permit application itself demonstrates uncertainty about the data from the Dyersburg monitor. The Air Quality Impact Analysis submitted as Exhibit C to the BRS Application, Rev. 2 lists Dyersburg background $PM_{2.5}$ values of both 9.44 $\mu g/m^3$ and 10.4 $\mu g/m^3$. Without explanation and contrary to Appendix W, BRS used the lower value, not the higher value, as "representative."

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 16

location in an upwind direction from the proposed site (considering prevailing winds); thus, it is characteristic of the regional ambient air.

Importantly, Marion is located far enough from Memphis to not be overly influenced by facilities and urban areas there yet close enough to be impacted by the man-made emissions flowing from Memphis on the prevailing winds to the area of the proposed BRS Facility. The Dyersburg monitor, while similarly located in a small town with nearby residences and rural areas, is over 10 kilometers farther away from the proposed BRS Facility (at about 65 kilometers) and located downwind of the proposed source area. Monitoring conducted at Dyersburg will have already been diluted beyond the influences at the BRS location in its upwind fetch and are not representative.

Had BRS used the proper Marion monitor, it would have modeled an exceedance of the NAAQS. For the three-year period of 2010-2012, the $PM_{2.5}$ annual average recorded at the Marion monitor was 10.66 $\mu g/m^3$ based on the monitor's raw data. Adding this to the BRS reported final multisource impact of 2.47 $\mu g/m^3$ in BRS's Permit would have resulted in a combined total of 13.13 $\mu g/m^3$ $PM_{2.5}$, which exceeds the NAAQS. The Permit fails to meet the $PM_{2.5}$ NAAQS when using the appropriate Marion $PM_{2.5}$ monitoring data.

In fact, the use of *any* other monitor in the area, even without correcting the other deficiencies in the BRS modeling, would have resulted in a modeled plus monitored sum exceeding the NAAQS. The true $PM_{2.5}$ background levels at all the Arkansas monitors near the proposed BRS site showed annual averages between 10 and 11$\mu g/m^3$. The ambient $PM_{2.5}$ background concentrations were: Marion – 11.2$\mu g/m^3$, Newport – 10.2$\mu g/m^3$, and Helena – 10.6 $\mu g/m^3$.[12] Had BRS used the background $PM_{2.5}$ concentrations from any of the Arkansas monitors, when combined with BRS's modeled prediction of its direct $PM_{2.5}$ emissions impact (even without consideration of the impact of secondary formation of $PM_{2.5}$ from BRS's $SO_2$ and $NO_x$ emissions), BRS would have shown an exceedance of the NAAQS and would have failed to make the PSD demonstration necessary to obtain the Permit.

BRS chose instead to use a non-representative monitor knowing it would model just below the $PM_{2.5}$ NAAQS limit. This is unjustifiable. BRS has failed to demonstrate it will not cause or contribute to a violation of the NAAQS. Regardless of whether BRS and ADEQ seek to

---

[12] Additionally, an official air monitoring station in Blytheville, Arkansas, was located only 19 miles away from the proposed BRS site and was in operation from 2000 to 2005 monitoring ambient $PM_{2.5}$ concentration in Mississippi County. The Blytheville station was discontinued after 2005, but there was a period of six years during which both the Blytheville station and the Dyersburg station were operational. For five out of the six years, the annual average $PM_{2.5}$ level at Blytheville was higher than that of Dyersburg. The differences are 0.3-1.0 $\mu g/m^3$. The six-year comparative data indicates that the background $PM_{2.5}$ level in Mississippi County is higher than the background in Dyersburg. If the contribution from the proposed BRS Facility (i.e., the modeled concentration) was added to a higher background level, the annual $PM_{2.5}$ NAAQS would have been exceeded.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 17

qualify the monitor as "representative" based on temporal closeness or regional representativeness, it does not qualify under either test. It is too far away to be local and it does not have "similar natural and distant man-made sources." The modeling done using data from the Dyersburg monitor violates the PSD rules and requires that the Permit be vacated.

**4.      BRS failed to model or otherwise consider secondary PM$_{2.5}$ emissions.**

CAA Section 165 precludes the issuance of any PSD permit until the "owner or operator of such facility demonstrates ... that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year (B) national ambient air quality standard in any air quality control region." 42 U.S.C. § 7475(a)(3)(A) & (B); *see also* APC&E Reg. 19.904(A); 40 C.F.R. § 52.21(l). Appendix W includes provisions addressing secondary formation of particulate. *See* 40 C.F.R. Part 51, App. W, §§ 5.1, 5.2.2.1. The EPA noted in its final rule for implementation of the New Source Review ("NSR") program for PM$_{2.5}$ that the Section 165(a)(3) demonstration could not be made without considering secondary PM$_{2.5}$ formed from precursor emissions.[13]

The EPA has repeatedly promulgated rules which require the consideration of secondary PM$_{2.5}$ formed from precursor emissions. Arkansas has been required to consider PM$_{2.5}$ as part of its PSD review since 1997, when the first PM$_{2.5}$ NAAQS was promulgated by the EPA. Following enactment of the PM$_{2.5}$ NAAQS, EPA guidance stated that PM$_{10}$ could be used as a surrogate for PM$_{2.5}$ PSD compliance demonstrations; however, allowing the use of PM$_{10}$ as a surrogate for PM$_{2.5}$ is not the same as not considering PM$_{2.5}$ emissions. *See* Memorandum from John S. Seitz, Director Office of Air Quality Planning & Standards, addressing Interim Implementation of New Source Review Requirements for PM$_{2.5}$, Oct. 23, 1997 ("Seitz Memo"). Just the opposite, with adoption of the 1997 NAAQS, EPA was requiring SIP-approved PSD programs, such as Arkansas', to consider PM$_{2.5}$ emissions through implementation of the PM$_{10}$ surrogate policy. The 2008 PM$_{2.5}$ Implementation Rule announced that SIP-approved states could continue to use the PM$_{10}$ surrogate policy. In 2010 guidance, the EPA announced that the use of the PM$_{10}$ surrogate policy would no longer be available to any source in a SIP-approved state after May 2011. *See* Memorandum from Stephen D. Page, Director, Office of Air Quality Planning and Standards, addressing Modeling Procedures for Demonstrating Compliance with PM$_{2.5}$ NAAQS, Mar. 23, 2010 ("2010 Page Memo"). EPA's action on the PM$_{10}$ surrogate policy is binding upon states, such as Arkansas, even though they are implementing a SIP-approved PSD program, as demonstrated by the Administrator's decision in the *Louisville Gas & Electric*

---

[13] 73 Fed. Reg 28,321, 28,326 (May 16, 2008). "With regard to PSD, section 165(a)(3) of the Act states that new or modified major sources must demonstrate that emissions 'will not cause, or contribute to, air pollution in excess of any * * * NAAQS in any air quality control region * * *.' A source could not reasonably make this demonstration without considering precursors that EPA has identified for this purpose."

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 18

Co. ("LG&E") case.[14]  In the *LG&E* case, the Administrator considered a petition to object filed against a title V permit issued by Kentucky to Louisville Gas & Electric that alleged that the PSD permit limits for $PM_{2.5}$ were inadequate because Kentucky had applied the $PM_{10}$ surrogate policy without completing the necessary analysis to show it was appropriate.  The Administrator objected to the permit and remanded the permit back to Kentucky on the basis that Kentucky had not met the requirements of EPA's surrogate policy as then articulated notwithstanding the fact that Kentucky's PSD program was admitted to be SIP approved.  *LG&E*, at 3 (PSD approval status) & 44-45 (issuance of objection for failure to comply with surrogate policy).

By 2013, when BRS submitted its initial and revised permit applications, the $PM_{10}$ surrogate policy was no longer an available option and Arkansas was no longer allowed to use the $PM_{10}$ surrogate policy as a substitute for evaluation of $PM_{2.5}$.[15]  The entire $PM_{10}$ surrogate policy had been created by EPA guidance and it was subsequently removed by EPA guidance. What remains is the 1997 $PM_{2.5}$ NAAQS (as well as the subsequent 2008 and 2010 NAAQS) which require any PSD reviewing authority, including ADEQ, to ensure $PM_{2.5}$ compliance with the PSD program, including a NAAQS compliance demonstration. Put simply, at the time of the BRS permit issuance, secondarily formed $PM_{2.5}$ emissions are still $PM_{2.5}$ emissions (with the same negative public health effects at elevated concentrations).  As evidenced by EPA's considerable effort in developing the *Guidance for $PM_{2.5}$ Permit Modeling* (including consideration of the 2011 National Association of Clean Air Agencies Workgroup report and the public comments on the 2013 draft guidance), impacts from secondary $PM_{2.5}$ emissions are an important part of the $PM_{2.5}$ NAAQS demonstration. 42 U.S.C. § 7475(a)(3); 40 C.F.R. § 52.21(k).  It is clear that the definition of $PM_{2.5}$ emissions for purposes of PSD review includes secondarily formed $PM_{2.5}$. For example, the PSD $PM_{2.5}$ significance threshold includes both

---

[14] *In the Matter of Louisville Gas & Elec. Co.*, Trimble County, Kentucky, Title V/PSD Air Quality Permit #V-02-043, Revs. 2 and 3, Petition No. IV-2008-3 (EPA).

[15] EPA's current approach and recommendation to consider these secondary $PM_{2.5}$ emissions was issued in March 2013. *Draft Guidance for $PM_{2.5}$ Permit Modeling*, (EPA 454/D-13-001, Public Review Draft March 4, 2013, U. S. Environmental Protection Agency, Research Triangle Park, NC). In both documents, the fact that EPA is considering the secondary emissions is attributed to research over the past few years in terms of atmospheric conversion of $NO_x$ and $SO_2$ to nitrates and sulfates and the presence of the constituents on $PM_{2.5}$ filters at monitors across the United States.  Various approaches for assessing secondary $PM_{2.5}$ impacts due to precursor emissions of $NO_x$ and $SO_2$ are described in the EPA guidance.  These are: 1) a qualitative assessment, 2) a hybrid qualitative/quantitative assessment utilizing existing technical work, and 3) a full quantitative photochemical grid modeling analysis. None of these techniques were proposed, discussed, considered, or used in the modeling analysis provided as part of the BRS permit application or permitting process.  Even considering that the conversion rates from $NO_x$ to nitrates and $SO_2$ to sulfates is small, the fact that ambient monitors around the United States that have undergone species analysis have shown nitrate and sulfate contributions makes the consideration of these important $PM_{2.5}$ precursors pertinent to this analysis.  Thus, given these considerations, the secondary $PM_{2.5}$ precursor emissions should have been considered in this PSD modeling effort.  Given the proximity of the modeling for annual $PM_{2.5}$ to the NAAQS, it was improper for ADEQ to ignore this phenomenon with the resulting consequence if they had considered it, the modeling may have shown noncompliance with the NAAQS and the Permit would be invalid for yet another reason.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 19

direct $PM_{2.5}$ emissions and emissions of $PM_{2.5}$ precursors, $SO_2$ and $NO_x$. 40 C.F.R. §
52.21(b)(23)(i). While EPA's guidance on how to quantify the ambient impact of the secondary
formation of $PM_{2.5}$ may not be binding, BRS is still required to demonstrate compliance in some
manner. ADEQ and BRS could have opted to follow EPA guidance on how to qualitatively
consider secondary $PM_{2.5}$ or Arkansas could have developed its own approach to determining the
contribution of secondary $PM_{2.5}$ impacts on ambient air, but ADEQ and BRS did neither. They
simply ignored it and refused to consider it because they feared it would slow down the PSD
permit review process.

Likewise, the federal regulations in Appendix W, Section 5.2.2.1, which are incorporated
by the Arkansas SIP, explicitly address secondary $PM_{2.5}$. That section describes how modeling
should be conducted when required by a regulation. It provides, in part: "Simulation of
phenomena resulting in high ambient $PM_{2.5}$ can be a multi-faceted and complex problem
resulting from $PM_{2.5}$'s existence as an aerosol mixture. Treating secondary components of $PM_{2.5}$,
such as sulfates and nitrates, can be a highly complex and resource-intensive exercise."
Appendix W, Section 5.2.2.1. Thus, in a legally binding and federally enforceable regulatory
document incorporated by the Arkansas SIP, the EPA has set the stage for the mandatory
consideration of secondary formation of $PM_{2.5}$. By law, neither BRS nor ADEQ can simply
ignore secondary $PM_{2.5}$ emissions altogether for their individual or collective convenience. Yet,
this is precisely what has been done.

During the permitting process, BRS's permitting consultant, Steven Frey, sent an email to
ADEQ to dissuade ADEQ from requiring the inclusion of secondary $PM_{2.5}$ emissions in BRS's
modeling analysis. ADEQ's permit engineer sought guidance from his superiors on how to
handle the consideration of secondarily formed $PM_{2.5}$ in the permit application modeling and
ADEQ decided not to require BRS to address secondary formation of $PM_{2.5}$ in any way. Thus,
neither ADEQ nor BRS modeled or otherwise considered secondary formation of $PM_{2.5}$.

In addition to being contrary to federal law, BRS's exclusion of secondary formation of
$PM_{2.5}$ clearly runs afoul of EPA guidance and common sense – each of which dictates that it
should be considered. EPA *Draft Guidance for $PM_{2.5}$ Permit Modeling* was issued on March 4,
2013, more than three months before BRS submitted its final PSD permit application. Precursor
emissions, such as $SO_2$ and $NO_x$, are emitted as gases but react in the atmosphere to form
secondary particulate matter such as sulfates and nitrates. According to EPA, $SO_2$ and $NO_x$
undergo gas-phase reactions in the atmosphere to form secondary PM, most of which is within
the $PM_{2.5}$ fraction. These secondarily formed emissions constitute a large portion of $PM_{2.5}$; in
fact, EPA noted in the preamble to the $PM_{2.5}$ implementation rule,[16] that precursor emissions
contribute significantly to ambient $PM_{2.5}$ concentrations, producing about half of the

---

[16] 73 Fed. Reg. 28321, 28325.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 20

concentration nationally and that in most areas of the country precursor $PM_{2.5}$ emissions are major contributors to $PM_{2.5}$ ambient concentrations. BRS, through its retained expert, agreed that the EPA research had determined that secondarily formed $PM_{2.5}$ constituted a significant portion of overall $PM_{2.5}$.

The proposed BRS Facility will emit significant amounts of the precursor emissions $SO_2$ and $NO_x$ leading to the formation of significant amounts of secondarily formed $PM_{2.5}$. The emissions of $SO_2$ and $NO_x$ from the proposed BRS Facility are permitted at 347.8 tons per year ("tpy") and 1,128.4 tpy, respectively (1,476.2 tpy total), well above the 40 tpy level threshold for the assessment of secondary $PM_{2.5}$. To put this in perspective, at the hearing on this matter, BRS's expert introduced a paper entitled "Methods for Single Source Ozone and $PM_{2.5}$ Analysis," which he published at the Air and Waste Management Association conference and which discusses precursor emissions. The facility analyzed in the paper emitted significantly less precursor emissions than the proposed BRS Facility is permitted to emit. That facility was permitted to emit *111* total tpy of the precursors $SO_2$ and $NO_x$ – *nearly 13 times less than the proposed BRS Facility*. Even with this relative minor amount of precursor emissions (in relation to the BRS Facility), BRS's expert calculated that the other facility's precursor emissions would result in additional air quality impacts of 0.04 $\mu g/m^3$ of $PM_{2.5}$ annual average emissions. He did not bother to calculate the impacts for the proposed BRS Facility. Yet, despite the fact that the BRS Facility would emit 13 times the amount of precursors as the facility in the study, BRS's expert concluded that secondarily formed $PM_{2.5}$ from the BRS Facility would be "insignificant." This simply does not equate with reality. The BRS Permit states that the annual $PM_{2.5}$ background concentration for the facility is 9.44 $\mu g/m^3$ and that the new facility will result in an annual $PM_{2.5}$ impact of 2.47 $\mu g/m^3$. These two concentrations (background plus projected impact) are added together to project that the future air quality should exhibit a $PM_{2.5}$ concentration 11.91 $\mu g/m^3$. The annual $PM_{2.5}$ NAAQS is 12 $\mu g/m^3$, which means that only 0.09 $\mu g/m^3$ separates the modeled BRS Facility impact from the NAAQS. If a facility which emits thirteen times less precursor emissions than the BRS Facility results in additional air quality impacts of 0.04 $\mu g/m^3$ of $PM_{2.5}$ annual average emissions, it cannot possibly be said that BRS's precursor emissions are "insignificant" – indeed, there is no technical explanation for the failure to consider these emissions.

Considering the timing, the level of $PM_{2.5}$ precursor emissions, and the fact that the modeled $PM_{2.5}$ level in the BRS June 2013 application (i.e., Application, Rev. 2) for primary $PM_{2.5}$ alone was already nearly equal to the annual $PM_{2.5}$ NAAQS level, completely disregarding the secondary $PM_{2.5}$ is a violation of the PSD permit rule, and the Permit must be invalidated. That guidance has been finalized by EPA[17] with continued emphasis on secondary formation of $PM_{2.5}$ from $NO_x$ and $SO_2$.

---

[17] *See* http://www.epa.gov/ttn/scram/guidance/guide/Guidance_for_PM25_Permit_Modeling.pdf.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 21

Although, on the one hand, BRS ignored federal regulation and EPA guidance on secondary formation of $PM_{2.5}$, BRS used that same guidance when it was to its advantage to do so. EPA guidance allows permit applicants to compare 24-hour $PM_{2.5}$ impacts (plus monitored background) to the NAAQS based on the multi-year average of the eighth highest (i.e. 98[th] percentile) modeled 24-hour concentration, contingent upon the applicant assessing the impact of secondary $PM_{2.5}$ emissions. *See* Memorandum from Stephen D. Page, Director, Office of Air Quality Planning and Standards, addressing Draft Guidance for $PM_{2.5}$ Permit Modeling, Mar. 4, 2013 ("2013 Page Memo"). In contrast, the 2010 Page Memo allowed for a screening analysis that did not account directly for secondary emissions formation, but required that the applicant use the first highest 24-hour direct $PM_{2.5}$ model impact in its modeling. By using the eighth highest 24-hour direct $PM_{2.5}$ modeled concentrations but then ignoring secondary $PM_{2.5}$, BRS chose a self-serving mix and match approach to using the available EPA guidance.

Rather than follow the screening approach recommended in the 2010 Page Memo for assessing secondary formation of $PM_{2.5}$, BRS chose the approach that did not take into account the secondary formation of $PM_{2.5}$ but rather than using the highest 24-hour average, BRS used the multi-year average of the eighth highest 24-hour $PM_{2.5}$ projected impacts in the cumulative impact assessment that supported the permit application. That is to say, BRS followed the 2013 Page Memo, but only insofar as it was to BRS's benefit, and in a way that is not in any manner authorized or condoned by the EPA guidance. The 2013 guidance required that projections based on the eighth highest impact be accompanied by an analysis of precursor emissions, and the assessment of the impacts of secondary formation of $PM_{2.5}$ resulting therefrom, which BRS did not consider. If BRS chose to use the eighth highest $PM_{2.5}$ average in its modeling, it was underlined{required} to assess the impacts of secondary formation of $PM_{2.5}$ emissions. Yet, it did not. Alternatively, if BRS chose to perform a screening analysis that did not account directly for secondary formation of $PM_{2.5}$, it was required to use the highest average 24-hour. The mix-and-mismatch approach followed by BRS fails to meet the required PSD demonstration.

BRS is required to demonstrate that its emissions will not cause or contribute to an exceedance of the NAAQS. 42 U.S.C. § 7475(a)(3); 40 C.F.R. § 52.21(k). It has failed to do so. BRS's exclusion of secondary $PM_{2.5}$ emissions from its modeling violates the PSD rules and ignores clear EPA guidance and requires that the Permit be vacated.

**5.      BRS failed to model all sources.**

The inventory of sources at the BRS Facility and the modeling employed by BRS in demonstrating that the NAAQS would be attained is deficient in a number of ways. This section outlines the legal requirement to provide accurate emissions information and to properly model the source. The following subsections provide detailed explanations of how the BRS emissions estimates and modeling failed to follow the correct procedures, resulting in a sham

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 22

demonstration of attainment of the NAAQS when BRS fully knew that, properly executed, the emissions estimates and modeling would demonstrate an exceedance even using the unrepresentative Dyersburg monitor.

Federal PSD regulations require that, "[t]he owner or operator of a proposed source … shall submit all information necessary to perform any analysis or make any determination." 40 C.F.R. § 52.21(n). This includes "emission estimates." 40 C.F.R. § 52.21(n)(1)(iii). The regulations continue that the owner or operator of a proposed source "shall demonstrate that allowable emission increases from the proposed source" would not cause or contribute to a NAAQS violation. 40 C.F.R. § 52.21(k). Likewise, Appendix W, Table 8-2, requires the use of the maximum allowable emission limit or federally enforceable permit limit for the source model input. 40 C.F.R. Part 51, App. W, Table 8-2. As noted above, these requirements have been incorporated by Arkansas pursuant to APC&EC Reg. 19.904.

CAA Section 165 requires that no permit may be issued until the "owner or operator of such facility demonstrates … that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year (B) national ambient air quality standard in any air quality control region." 42 U.S.C. § 7475(a)(3)(A) & (B). Likewise, APC&E Reg. 19.904(A) adopts the federal PSD regulations at 40 C.F.R. § 52.21 in effect on November 29, 2005, with minor exceptions not relevant here. Subsection 52.21(l) requires that modeling shall comply with Appendix W of 40 C.F.R. Part 51. 40 C.F.R. § 52.21(l)(1). No variation is allowed unless approval is obtained from the Administrator, not just the director of ADEQ. See 40 C.F.R. § 52.21(l)(2); see also APC&E Reg. 19.904(D)(3). No such approval was sought or obtained. Appendix W includes provisions addressing secondary formation of particulate. See 40 C.F.R. Part 51, App. W, §§ 5.1, 5.2.2.1.

**a. BRS failed to include certain natural gas combustion sources in its modeling.**

In the BRS Permit, it is undisputed that numerous natural gas combustion sources were omitted from the Draft Permit, specifically, sources SN-04 through SN-19, and from all modeling done by BRS in support of the Draft Permit. None of these sources were included in the modeling done by BRS as part of the application process and which formed the basis of the issuance of the Draft Permit nor did BRS model these sources contained in the final Permit. Thus, neither BRS nor ADEQ ever performed the statutorily required modeling based on the permitted emission limits for all of the natural gas combustion sources included in the Permit.[18]

---

[18] As set forth, below, BRS has also failed to model other aspects of the final Permit.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 23

Independent modeling conducted by Nucor demonstrates that the omitted sources and the actual permit emission limits will have a significant effect on the modeled concentrations of $PM_{2.5}$ to be emitted from the proposed BRS Facility, even without consideration of secondary formation of $PM_{2.5}$. Nucor's calculations determined that modeling of the proposed BRS Facility $PM_{2.5}$ emissions based on the final permit emission limits and sources will result in a significant increase from the BRS modeled value of 2.47 µg/m³ to a minimum[19] of 2.79 µg/m³. Adding this value to the background concentration (Dyersburg, Tennessee) selected by BRS of 9.44 µg/m³ results in a total air quality impact of 12.23 µg/m³, about 2% above the NAAQS of 12 µg/m³. This calculation alone, without quantification of the formation of the scientifically certain secondary formation of $PM_{2.5}$ and without considering the concerns over use of the Dyersburg monitor value and without regard to the other deficiencies in the Permit discussed below, demonstrates a violation of the NAAQS and is sufficient in and of itself to preclude issuance of the Permit.

BRS's exclusion of natural gas emission sources from its modeling is in violation of the PSD rules and demands that the Permit be withdrawn and a new application be submitted with new modeling reflecting the inclusion of the natural gas emission sources.

**b. BRS failed to correctly model fugitive emissions from the Melt Shop and Galvanizing Line.**

The Melt Shop and Galvanizing Line rooftop fugitive emissions were not modeled correctly, resulting in an underestimation of the concentrations of emitted pollutants, especially at receptors close to these sources. If sources are not properly characterized, the resultant ambient air concentration estimates from modeling will be in error.

The "volume" sources representing the rooftop fugitive emissions for the Melt Shop fugitives (F_MSV1 through F_MSV34) and the Galvanizing Line fugitives (FGL1V1 through FGL1V11) were not characterized properly. Two characterizing parameters are incorrect, namely, the height of release and the initial vertical dimension (which is the same as the initial vertical dispersion coefficient, $\sigma_{z0}$). Table C-2 of Appendix C to the Application, Rev. 2, as well as the input files for the dispersion modeling (example, $PM_{2.5}$ Multi An.ADI), were used as the reference for reviewing the volume source characterizations. Also used were the heights of the buildings themselves which determine the heights of a related volume source of emissions. As stated in the AERMOD user's guide: "The AERMOD VOLUME source algorithms are used to model releases from a variety of industrial sources, such as building roof monitors, multiple vents, and conveyor belts." Emissions emitted from a roof monitor such as those for the Melt Shop emit from the top of the building and are mixed into the lee of the building, thus creating

---

[19] The number will likely be higher when the other modeling deficiencies are addressed correctly and the secondary formation of $PM_{2.5}$ is considered.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 24

the volume of emissions rather than a specific point like a stack type source. Following the AERMOD guidance in Section 3.3.2.2 of the AERMOD user's guide, the release height (Relhgt) should be set equal to the center of the volume source above ground level (i.e., at half the height of the structure). As an example, the roof monitor fugitive emissions from Melt Shop, Bay 2, are emitted from the building height of 48.77 meters with the volume source being the overall height of the building. Thus, the height of release should have been one half of this height at 24.35 meters. However, the BRS modeling and modeling conducted by ADEQ set the height at the full height of the buildings which is assuming that the volume source will be twice the height of the building. Thus, the modeling took credit for all releases at a height twice the height that they were emitted. This same error was made in all Melt Shop and Galvanizing Line rooftop fugitive emissions.

Additionally, the initial vertical dimensions ($\sigma_{zo}$) noted in Table C-2 of Appendix C to the Application, Rev. 2, as well as the input files for the dispersion modeling, were incorrect. As per Section 3.3.2.2 of the AERMOD user's manual, Table 3-1, for determining initial vertical dimensions, for an elevated source on or adjacent to a building, the $\sigma_{zo}$ is determined by dividing the building height by 2.15. Thus, using the same example of the roof monitor fugitive emissions from Melt Shop, Bay 2, being emitted from the building height of 48.77 meters, the $\sigma_{zo}$ for these volume sources should be 48.77 meters divided by 2.15 or 22.68 meters. The Appendix C, Table C-2, values for this volume source were set to 45.37 meters. Thus, the modeling error that was made was that the emissions were emanating from a rooftop twice the height of the building and that value was used to calculate the $\sigma_{zo}$. The effect this has on the modeling is to take credit for a plume that is twice as dispersed in the vertical as it should be following the physics that are built into the volume source model in AERMOD. Overall, this error in the Melt Shop and Galvanizing Line fugitive source characterization will underestimate concentrations of emitted pollutants, especially at receptors close to these sources.

BRS's failure to correctly model fugitive emissions from the Melt Shop and Galvanizing Line violates the CAA and PSD rules and requires that the Permit be vacated.

**c. BRS failed to model building conditions and downwash from nearby regional sources.**

Buildings are important to consider in the modeling because they cause a phenomenon known as "building downwash." Turbulence forms around a building as the air tries to pass around it. When a source of emissions is located close enough to this turbulent zone, it can cause the emitted plume to be mixed closer to the ground. For a stack near a building, this generally results in higher ground level concentrations. BRS considered all buildings and their influence for the proposed Osceola facility, except three sites: Bunge, Viskase, and Plum Point. EPA's *Guidelines for Air Modeling* explicitly requires consideration of downwash. *See* 40 C.F.R. Part 51, App. W, § 6.2.2(b).

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 25

No building downwash effects for these three sites close to the proposed BRS Facility were considered in the dispersion modeling even though the area of maximum impacts was well within the potential zones of influence of buildings at these sites. Specifically, the air modeling did not consider source and building characterization properly for these nearby facilities, nor were all model options used correctly, resulting in a violation of the annual $PM_{2.5}$ NAAQS of 12.00 $\mu g/m^3$. Because the building downwash effects at these three facilities were not considered in the dispersion modeling, inclusion of downwash impacts results in calculated ambient impacts that are greater than the PSD increments and the annual $PM_{2.5}$ NAAQS. Accordingly, the modeling fails to demonstrate that the proposed BRS Facility does not cause or contribute to a violation of the NAAQS.

Typically, buildings do not have to be considered for "regional" sources in such a dispersion modeling analysis because building downwash has its greatest effects in the near field to the buildings, e.g., up to 10 building heights or so. However, because the maximum combined source impacts were in the vicinity of the Viskase and Bunge properties, because each facility has buildings that will influence the plume behavior with increased turbulence, and because the multi-source annual $PM_{2.5}$ concentration is just below the 12 $\mu g/m^3$ NAAQS, the buildings at Bunge and Viskase should have been considered in the modeling. To substantiate this claim, the buildings at Bunge, Viskase, and Plum Point were added to the $PM_{2.5}$ AERMOD input file (file name, MultiAn.ADI dated 6/21/2013) and rerun with the full five year meteorological data set. BRS's initial run of AERMOD (Version 12345) yielded an annual $PM_{2.5}$ concentration over all sources (including regional sources) of 2.57 $\mu g/m^3$. Results of the new analysis, including the buildings for Bunge, Plum Point, and Viskase, yielded a higher annual maximum $PM_{2.5}$ concentration of 2.76 $\mu g/m^3$. If this value is added to the background concentration selected by BRS of 9.44 $\mu g/m^3$, the resultant total air quality impact is of 12.2 $\mu g/m^3$ which is about 1.7% above the NAAQS of 12 $\mu g/m^3$ and does not meet the NAAQS. Therefore, the modeling will show noncompliance with the NAAQS and confirm the invalidity of the Permit.

BRS's exclusion of building conditions and downwash from nearby regional sources is in violation of the PSD rules and demands that the Permit be vacated.

**d. BRS failed to properly model fugitive windblown emissions.**

BRS's analysis of fugitive windblown emissions does not demonstrate effectively the impacts due to these sources. In the wind speed data for the Blytheville meteorological data sets (KHKA_07_11.sfc, which is the full five year hourly data set used in portions of the dispersion modeling), only one hour of data over the whole period of records (43,824 hours) had a wind speed that met the 14 meters per second wind speed threshold to allow windblown dust. This appears to be an underestimate of the emissions that could be attributable to wind erosion from the scrap and slag piles.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 26

Because the modeled $PM_{2.5}$ result is already nearly equal to the $PM_{2.5}$ annual NAAQS, the corrected $PM_{2.5}$ emissions will be higher and will likely cause violation of the NAAQS, and thus render the Permit invalid.

**e. BRS underestimated emissions from the storage piles.**

Emissions estimates for the storage piles (Sources SN-99A and SN-99B) are underestimated based on assumptions that are inconsistent with common industry practice. In order to calculate the particulate emissions that would result from wind blowing across storage piles, it is necessary to adequately account for the surface area across which the wind will blow. For Sources SN-99A and SN-99B, the surface area of each pile is calculated in the application as though it exists as a two-dimensional pile that encompasses the entire storage yard. In reality, these piles will exist in three dimensions and must be calculated as such to account for the surface area of the side of the pile. Further, it is not logistically possible to store this material in one large pile, since each of these storage areas will encompass 38 acres and 6 acres, respectively, as represented in the BRS permit application. Accounting for the increased surface area that would result from multiple piles, as well as from three-dimensional piles, will greatly increase the particulate emissions. Since the air modeling result is already nearly equal to the $PM_{2.5}$ annual NAAQS, any increase in $PM_{2.5}$ emissions would most probably result in an exceedance of the standard, which is illegal according to 40 C.F.R. § 52.21.

**6.     BRS failed to model permitted limits.**

In addition to excluding sources from modeling, BRS also failed to model sources at the allowable limits set forth in the Permit. "The owner or operator of a proposed source … shall submit all information necessary to perform any analysis or make any determination." 40 C.F.R. § 52.21(n). This includes "emission estimates." 40 C.F.R. § 52.21(n)(1)(iii). The PSD regulations state that the owner or operator of a proposed source "shall demonstrate that allowable emission increases from the proposed source" would not cause or contribute to a NAAQS violation. 40 C.F.R. §52.21(k) (emphasis added). Likewise, Appendix W, Table 8-2, requires the use of the maximum allowable emission limit or federally enforceable permit limit for the source model input. 40 C.F.R. Part 51, App. W, Table 8-2. As noted above, these requirements are part of the approved Arkansas SIP pursuant to APC&EC Reg. 19.904.

BRS failed to model the actual emission limits contained in the final Permit. The Permit emission limits for several natural gas combustion sources were higher than the emission rates contained in the final permit application, Application, Rev. 2. A comparison of Application, Rev. 2, Appendix C, Tables C-1 and C-2 $PM_{2.5}$ annual emission factors to the desired permit limits in the application determined that these permit limits were not modeled at their full value. Indeed, merely comparing the natural gas combustion sources emission rates as set forth in the final

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 27

application, Application, Rev.2, to the same emission rates for the same sources in the Permit, the total lb/hr emissions were increased nearly 6-fold, from 0.54 lbs/hr to 2.90 lbs/hr, while the tons per year doubled, from 2.36 tons/yr to 4.20 tons/yr. Neither BRS nor ADEQ modeled the final permit limits.

Independent modeling conducted by Nucor demonstrated that the effect of modeling the actual permit emission limits will have a significant effect on the modeled concentrations of $PM_{2.5}$ to be emitted from the proposed facility. When the emissions for natural gas combustion sources were modeled at the limits in the Permit,[20] the cumulative modeled impact was 2.79 $\mu g/m^3$, instead of 2.47 $\mu g/m^3$, resulting in a predicted $PM_{2.5}$ concentration of 12.23 $\mu g/m^3$, which exceeds the NAAQS for annual $PM_{2.5}$. Here, BRS failed to model many of the natural gas combustion sources as the allowable limits as set forth in the Permit, and thus BRS has not demonstrated that emissions from the BRS Facility will not cause or contribute to an exceedance of the NAAQS. This calculation alone, without quantification of the formation of the scientifically certain secondary formation of $PM_{2.5}$ and without considering the concerns over use of the Dyersburg, Tennessee monitor value, demonstrates a violation of the NAAQS, rendering the Permit invalid.

BRS did not conduct modeling based on allowable emission limits in the final BRS Permit, as required by Appendix W, Section 8, Table 8-2. This fact alone makes the BRS modeling deficient, especially due to the fact that BRS also omitted numerous source emissions in the modeling of the draft limits. Such modeling should have been done to demonstrate compliance with the NAAQS and BRS's failure to do so is error. Further, based on Nucor's modeling, inclusion of the proper limits and omitted sources results in a NAAQS violation. The Permit should be vacated.

**7.      BRS modeling was improperly based on an incomplete layout of the proposed BRS Facility under the circumstances of this case.**

The final facility layout of operations, buildings, stacks, roads, and fence line is critical to calculating the most representative ambient concentrations from the dispersion modeling. Section 8.1.2.b Plant Layout of the *Guideline on Air Quality Models* provides a recommendation to consider the layout of a facility in terms of "the distance and direction between stacks, building parameters (length, width, height, location, and orientation relative to stacks for plant structures...." BRS's Application, Rev. 2 contains an incomplete design and placement of all emission sources. Changes in the design and placement of emission sources will affect the accuracy of modeling results upon which the Permit was issued. Under the circumstances of this

---

[20] Again, it must be emphasized that the other omissions from the modeling were not corrected by Nucor in its model since it did not have the data on which to conduct the modeling. Rather Nucor simply ran the BRS model substituting the actual Permit limits for the limits in the Application, Rev. 2.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 28

case, because BRS's modeling showed that its impacts were so close to the PM$_{2.5}$ NAAQS, and because modeling of the final permit limits showed exceedances of the PM$_{2.5}$ NAAQS, it was improper to issue the Permit based on an incomplete layout and design of emission sources and processes. The Application, Rev. 2, contains several sections indicating that the design had not been finalized and were subject to change:

    a.  Section 1.6 states that engineering work will continue on the engineering and layout of Phase II of the proposed BRS Facility while Phase I is being built.

    b.  Section 2.1 "General Description" states: "It is important to note that the drawings provide preliminary information related to site layout, process areas, equipment and emission exhaust stacks. The information is subject to change pending final engineering …."

    c.  The following Process Flow Diagram Figures all state that all equipment capacities or flow rates are "estimates and subject to change pending final engineering": Fig. 2-3a EAF Flux System Storage; Fig. 2-3b Flux and Carbon Injection Delivery to EAF; Fig. 2-4a LMF Flux System Storage; Fig. 2-4b Alloy Storage and Delivery System for LMF; Fig. 2-4c Alloy Delivery Systems for LMF; Fig. 2-5a Alloy Delivery System for RH-Degasser; and Fig. 2-7 Dust Collection System Phase I.

    d.  There are also media reports indicating that the design was merely preliminary. *See* June 25, 2013 issue of *American Metal Market* magazine, which contains an article about BRS, which states: "Equity holders and other financiers will be visiting the proposed 1,200 acre site some three miles south of Osceola, Arkansas, June 25, Clif Chitwood, Mississippi County economic developer, told *AMM*, while engineers are finalizing 'tweaks,' including rail layouts on the land."

    e.  Figure 2-7 of Application, Rev. 2, which concerns the dust collection system, states that "all flow rates are estimates and subject to change pending final engineering."

    f.  Application, Rev. 2 did not consider the emissions or impacts of material delivery in product shipment by barge. This omission is inconsistent with the Regulation 19.904 "alternative sites" analysis included in the introduction of the Permit, which states that access to the river is an important site criteria.

    g.  Appendix C of the Application, Rev. 2, states "[t]he results provided in Table C-5 represent predicted impacts from modeling submitted for an earlier version of this application." Because the January 2013 version did not include modeling, but the

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 29

March 2013 Revision 1 application did include modeling, it was concluded that the modeling referred to above came from the March 2013 application. The Appendix C text further states that project emissions have decreased and thus no new modeling was performed because decreased emissions indicates lower concentrations and no need to remodel. This was a flawed assumption which could affect the outcome of the modeling. For one, other parameters than just the emissions changed from the March 2013 to June 2013 modeling analysis. Stack heights were raised, sources moved and other unfound changes which will affect the magnitude of the ambient impacts as well as the location where they occur. Thus, not remodeling all of the proposed facility changes ignores the fact that potentially more receptors could have had impacts greater than the applicable SILs and the area of significant impacts from the BRS Facility may have been larger. This fact was never objectively or quantitatively demonstrated.

The Permit should be vacated.

**8.    BRS submitted flawed modeling of the Bunge Grain Elevator.**

Federal law requires "the owner or operator of the proposed source ... [to] demonstrate that allowable emission increases from the proposed source or modification ... would not cause or contribute to air pollution in violation of (1) any national ambient air quality standard in any air quality control region; or (2) any applicable maximum allowable increase over the baseline concentration in any area." 40 C.F.R. § 52.21(k); *see also* 42 U.S.C. § 7475; APC&EC Reg. 19.904(A). Federal law further requires that modeling comply with Appendix W of 40 C.F.R. Part 51. 40 C.F.R. § 52.21(l)(1). No variation is allowed unless approval is obtained from the Administrator, not just the director of ADEQ. *See* 40 C.F.R. § 52.21(l)(2); *see also* APC&EC Reg. 19.904(D)(3). No such approval was sought or obtained.

The BRS final permit application, Application, Rev. 2, demonstrated that the BRS Facility would have a cumulative impact modeled of 2.56 $\mu g/m^3$ for annual $PM_{2.5}$, but the Draft Permit and final Permit showed a cumulative modeled impact of 2.47 $\mu g/m^3$ for annual $PM_{2.5}$. This reduction in the Draft Permit was significant, yet unexplained.[21] Indeed, nothing in the SOB, Draft Permit, or final Permit explains the rationale for this change or the precise variables used by ADEQ or BRS to achieve the reduction in the $PM_{2.5}$ value from what was contained in BRS's final permit application.

---

[21] Using the modeled 2.56 $\mu g/m^3$ for annual $PM_{2.5}$, BRS modeled its cumulative impact at 12.00 $\mu g/m^3$, exactly at the $PM_{2.5}$ annual NAAQS. By using the unsubstantiated 2.56 $\mu g/m^3$ value, BRS modeled its cumulative impact at 11.91 $\mu g/m^3$, just below the annual NAAQS.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 30

Appendix W requires that emission input data from nearby sources such as the Bunge source for annual and quarterly averaging times be based on the "actual operating factor averaged over the most recent two years." 40 C.F.R. Part 51, Appendix W, Table 8-2. The modeling submitted by BRS in support of its final permit application was based on the emission limits set forth in Bunge's Title V Operating Permit issued by ADEQ. However, after BRS had submitted the final permit application (i.e., Application, Rev. 2), BRS reduced the emissions from one of the Bunge sources by 50%, based on an assumption that the Bunge source would not operate 24 hours per day (as BRS had stated in its application), but would only operate 12 hours per day. No data whatsoever was produced by BRS, or ADEQ, to prove whether in fact the subject Bunge facility was operating at only 50% of its permitted operating limits or any other evidence to support the use of an emission factor for the Bunge source that is less than the allowed permit limits for those sources.

In addition, footnote 7 to Table 8-2 of Appendix W cautions that the actual operating factor may only be used if the two year operating period is "representative." Footnote 8 to Table 8-2 also states that for sources that are not in operation or that have not "established" an appropriate factor, continuous operation should be used. There is no evidence that the Bunge source has established an appropriate operating factor, or of the Bunge source's actual operating factors over the most recent two years. Consequently, BRS improperly reduced the emission rates for the Bunge facility in its air quality impact analysis and thus BRS has not demonstrated that emissions from the BRS Facility will not cause or contribute to an exceedance of the NAAQS. BRS should have conducted a full two year analysis to demonstrate what the actual two year emissions from these sources are.

BRS improperly reduced the emission rates for the Bunge facility in its air quality impact analysis and thus BRS has not demonstrated that emissions from the BRS Facility will not cause or contribute to an exceedance of the NAAQS. Consequently, the Permit does not comply with applicable requirements. Because no demonstration was given for reducing the hours of operation in the modeling for the Bunge facility, the Permit should be vacated.

9.   **BRS conducted an improper BACT analysis.**

   a.   **BRS failed to conduct a proper top-down BACT analysis**

A critical requirement of the PSD application review process is a determination that the proposed facility will be outfitted with the BACT for pollutants. 42 U.S.C. § 7475(a)(4).

Under the CAA, one of the two primary requirements of the PSD program is a complete BACT analysis on a pollutant-by-pollutant and emission source-by-emission source basis. The BACT requirement is defined as an emission limitation based on the maximum degree of reduction for each pollutant subject to the PSD review which the permitting authority, on a case-

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 31

by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable. In order to satisfy this regulatory requirement, ADEQ must be able to demonstrate that the controls have the maximum degree of reduction. To this end, ADEQ required performance by BRS of a five-step, top-down analysis of each pollutant for each emission source.

While BRS represented that it performed a five-step, top-down analysis, in substance, the BACT analysis was wholly inadequate, and consequently, failed to satisfy PSD requirements. The following are errors in BRS's BACT analysis:

 i. For each BACT determination, a less effective air pollution control technology may be justified as BACT only if the more effective, technically feasible control technology is ruled out by economic infeasibility or another undesirable environmental and energy impact. EPA's guidance (1990 EPA NSR Workshop Manual) calls for the use of cost effectiveness in terms of dollars per ton ($/ton) of pollutant controlled to determine the economic feasibility for technically feasible control options. This practice is widely used in PSD permits across the country. However, throughout the BACT analysis in the BRS permit application, no cost effectiveness evaluation was performed on technically feasible control options, and a number of potential control technologies were either eliminated improperly or were not considered at all. Consequently, the BACT analysis violated 40 C.F.R. § 52.21 by failing to implement the maximum degree of reduction for each pollutant.

 ii. Step 2 of the PM BACT analysis for natural gas fired sources less than 100 MMBTU/hr states that the use of baghouses are technically infeasible because the low particulate loading of the exhaust would not make the baghouse cost effective. This statement must be supported by an economic analysis that calculates the average and incremental cost effectiveness in dollars per ton of pollutant removed. This economic analysis was not provided in the permit application.

 BRS also did not provide an economic or environmental analysis to justify the elimination of wet scrubbing as $SO_2$ BACT. In the $SO_2$ BACT analysis for the EAF, BRS rejected the use of wet scrubbing in Step 2 due to potential increases in water pollution and cost factors, which are not technical factors. These environmental and economic factors are more appropriately considered in Step 4 of a BACT analysis. Since these factors were not considered in Step 4, the BACT analysis does not contain the detailed economic and environmental analysis that would otherwise be required.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 32

iii.     Scrap preheating was eliminated from Greenhouse Gas ("GHG") BACT under
         Step 2 of the top-down BACT analysis, but BRS did not fully justify its
         elimination. In this analysis, BRS cites pollution and cost concerns, as well as
         questioning whether any energy savings could be realized. BRS states the scrap
         preheating would be technically difficult from an operational perspective, but
         does not state that it would be technically infeasible. None of the reasons for
         elimination described why this technology was technically infeasible.
         Environmental and economic factors are not considered in Step 2 of the top-down
         BACT analysis. Regardless, it is not appropriate for the permit applicant to
         speculate on the reasoning for elimination of a potential control technology.
         Rather, the permit applicant is obligated to document these reasons and provide
         tangible justifications to allow the permitting authority to make an informed
         decision and for the public to be able to make informed comments. It was
         improper for ADEQ to accept this BACT, and doing so violated the PSD
         requirements and invalidates the BRS Permit.

iv.      The BACT analysis for fugitive emissions is not valid and the fugitive emissions
         are severely underestimated. The BACT analysis for Source SN-80 (Charge
         Crane) in Application, Rev. 2 is improper. The BACT analysis identified 3
         control options: fabric filter control (99% control efficiency), wet suppression
         (50-90% control efficiency), and fugitive dust control plan (>50% control
         efficiency). All three control options are considered technically feasible.
         However, the "dust control plan" option with the lowest control efficiency is
         selected as BACT, and no control options were eliminated for economic reasons.
         Other energy and environmental factors are not cited as reasons to eliminate the
         two higher efficiency control options. This analysis is contradictory because no
         control options were eliminated due to technical infeasibility or economic, energy,
         and environmental reasons. Yet, the least efficient control option was selected as
         BACT. This not only violated the EPA procedures for the BACT analysis, it also
         violated the definition and the intention of the CAA.

         At the conclusion of this BACT analysis, it was stated that "no emission limit is
         being proposed since there is no available method to this type of fugitive source."
         In the Emission Rate Table for SN-80, it is stated that this source is inside
         building; the process throughput is 3,400,000 tons/year or 250 tons/hr; and the
         emission rates for PM, $PM_{10}$, and $PM_{2.5}$ are 0.003, 0.0014, and 0.0002 lb/hr,
         respectively. It is impossible to have virtually zero emissions for processing 250
         tons of dusty scrap metals in an hour. To put this in perspective, 0.003 lb/hr
         translate to 1.36 milligrams per hour (mg/hr). The OSHA standard for particulate
         matter in the workplace is 15 $mg/m^3$. The volume of the 250 tons of steel is
         approximately 30 m3. If the PM concentration in the indoor air is a half of the

Bᴙᴀᴅʟᴇʏ Mᴜʀᴄʜɪsᴏɴ Kᴇʟʟʏ & Sʜᴇᴀ LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 33

OSHA standard (7.5 mg/m3), the PM discharged into the atmosphere due to displacement of the 250 tons of steel will be 225 mg/hr, higher than BRS's estimate of air emission from charge crane. The particulate matter generated from charging scrap metal is significantly more than workplace air. The emission rate for SN-80 is underestimated. If emissions from fugitive sources are correctly quantified, the total fugitive emissions will be significantly higher.

Emissions estimates for the storage piles (Sources SN-99A and SN-99B) are likewise underestimated as detailed in Section 5(e) above.

v.   $CO_2e$ BACT limits in the BRS Permit are not appropriate because they are energy input based, instead of product output based. The generally accepted method to establish BACT for $CO_2e$ is to use the product output as the base, i.e., how much $CO_2e$ is generated for each unit of product produced. The output based $CO_2e$ BACT is technology relevant and it measures and it measures energy efficiency. If the proposed technology is not energy efficient, more energy will be used to produce the same amount of product and more $CO_2e$ emissions will occur.

vi.   Scrap degreasing was improperly eliminated as VOC BACT.  In Step 2 of the VOC BACT analysis for the EAF, BRS stated that scrap degreasing was technically infeasible because it would generate more pollution than it would prevent and because it would take thousands of gallons of water to accomplish. BRS's Step 2 analysis did not substantiate the physical, chemical, and engineering principles used to determine that scrap degreasing was technically infeasible, as described in the 1990 NSR Workshop Manual.  Further, the reasons stated by BRS appear to be environmental in nature, which is analyzed in Step 4, not Step 2.  Failure to provide an analysis of the environmental consequences of scrap degreasing denies the opportunity for the public to comment on the rationale used to include or exclude scrap degreasing as a potential control technology.

vii.   In the VOC BACT analysis for the Annealing and Coating Lines (SN-53), BRS stated that use of a regenerative thermal oxidizer ("RTO") achieving a 95% VOC control efficiency should be considered as VOC BACT.  The air permit requires its use in meeting a required VOC control efficiency of 90% as specified by 40 C.F.R. 60 Subpart TT.  An RTO can typically achieve between 95% - 99% control efficiency.  Neither the BRS BACT analysis nor the final Permit notes whether the control efficiency was evaluated as VOC BACT.  Since BACT is defined in 40 C.F.R. § 52.21 as a maximum degree of emissions limitation, failure to maintain a higher control efficiency means that the BACT requirement was not met.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 34

BRS should have implemented efficiency standards for all permitted combustion sources at the BRS Facility in order to implement Energy Efficiency Measures on a facility-wide basis in accordance with GHG BACT. Combustion sources such as furnaces and burners do not have a mandated efficiency, which would be appropriate for any combustion source in order to assure energy efficiency. Instead, ADEQ mandated a boiler efficiency of 75% for all boilers at BRS as GHG BACT. Energy Efficiency Measures must be determined as GHG BACT on a facility-wide basis in order to remain consistent with nationwide GHG BACT determinations. The Permit requires that combustion sources implement energy efficiency measures as BACT. However, the Permit does not specify exactly what measures must be implemented to be considered stringent enough to constitute BACT. BRS's lack of response to certain energy efficiency measures outlined in EPA's "Available and Emerging Technologies for Reducing Greenhouse Gas Emissions from the Iron and Steel Industry" is not acceptable.

viii.   The GHG BACT analysis does not conform to EPA guidelines with respect to Carbon Capture and Sequestration ("CCS"). In its analysis for GHG BACT, BRS eliminates CCS as a viable control technology in Step 2 of its top-down BACT Analysis, stating that CCS is technically infeasible. In EPA's white paper entitled "PSD and Title V Permitting Guidance for Greenhouse Gases," EPA states that it considers CCS to be an "available" control technology, even if it has never been installed on a similar source. The white paper contemplates that a facility that uses CCS may have to build and install the CCS system itself, rather than locate somewhere with an existing CCS system and/or local use for the compressed gases as the BRS BACT analysis seems to suggest. The technical reasons provided in the GHG BACT analysis for eliminating CCS from further consideration do not conform to existing EPA guidance on the issue, do not conform to previous nationwide GHG BACT determinations, and should not be considered when determining the technical feasibility of CCS. Therefore, ADEQ's failure in this regard, together with all other ADEQ deficiencies, violates PSD requirements and invalidates the BRS Permit.

ix.   BACT must be specific because emission rates are dependent on what specific control will be applied. BRS did not define the required work practices for dust control or scrap management at the plant. This lack of specificity not only causes unreliable emission rates (which affect modeling analysis), but also make the BACT unenforceable. In some instances, the BRS Permit defines BACT according to technologies and work practices that are not incorporated into the final Permit. Many of the material handling sources are required to utilize a dust control plan as PM BACT. However, the Permit does not specify what the dust control plan must contain in order to be considered stringent enough to constitute

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 35

BACT. The EAFs and LMFs are required to implement a scrap management plan in order to address $SO_2$, $NO_x$, CO, and VOC BACT. However, the Permit does not specify what the scrap management plan must contain in order to be considered stringent enough to constitute BACT.

Failure to consider all potential control technologies, especially those that are more stringent than the chosen level of BACT, violates 40 C.F.R. § 52.21 by failing to implement the maximum degree of reduction for the pollutant in question. BRS's improper BACT analysis violated 40 C.F.R. § 52.21 by failing to implement the maximum degree of reduction for each pollutant. Accordingly, the Permit should be vacated.

**b.  BRS used an unsupportable BACT limit for $CO_2e$.**

Use of incorrect emissions data violates the data completeness requirements of 40 C.F.R. § 52.21(n) and Appendix W, §8.1.2 and associated subsections. All of these regulations are part of the Arkansas PSD SIP. *See* APC&EC Reg. 19.904. The obligation for complete and accurate information is also found in APC&EC Reg. 19.404(C) and Reg. 26.409.

In BRS's permit application, including Application, Rev. 2, and in the Draft Permit, the BACT limit for $CO_2e$ was established by BRS, and accepted by ADEQ, as 0.0723 tons of $CO_2e$ per ton of steel produced. BRS indicated that this BACT limit was achievable based on an average carbon content of the projected steel product mix. However, upon review of the Draft Permit, BRS realized that this BACT limit would not be achievable for higher carbon steel product mixes that might be handled by the proposed BRS Facility. Accordingly, in its Comment No. 4, BRS requested that the BACT limit for $CO_2e$ be doubled "to reflect a worst case production output ...." In its response to that comment, ADEQ doubled the $CO_2e$ BACT limit to 0.155 tons $CO_2e$/ton of liquid steel produced. This is error and fails to satisfy GHG BACT.

BRS's own comments indicate that the established limit is indicative of "worst case production." In order to meet the statutory definition of BACT, a tiered set of lower limits representing the maximum degree of reduction achievable for other (lower) carbon content products must be established. BRS initially offered that the 0.0723 tons of $CO_2e$/ton of steel produced limit was achievable based on an average carbon content of their steel product mix. However, upon review of the Draft Permit, BRS realized that this limit would not be achievable for future higher carbon steel products and should "be adjusted to reflect a worst case production output." ADEQ adjusted the BACT limit upward to 0.155 tons $CO_2e$/ton of steel in the final Permit – doubling the emission rate. There was no technical explanation or supporting document available to the public for such a significant change.

It is clear that using the "worst case" scenario for higher carbon steel product mixes is inappropriate, by BRS's own admission in the Application, Rev. 2, for product mixes based on its

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 36

production of the average or lower carbon steel products. The use of this "worst case" GHG BACT limit is contrary to the statutory definition of BACT. CAA § 169(3), 42 U.S.C. § 7479(3); 40 C.F.R. § 52.21(b)(12). That is, the 0.155 limit is twice the original "average" expectation and is not "an emission limitation based on the maximum degree of reduction....which the permitting authority...determines is achievable" during times when lower carbon content steel products are manufactured. BRS must evaluate the emissions levels that are achievable under all operating conditions expected during the facility's service life, not just those representing one potential product mix or permitted fuel source.

The average $CO_2e$ emissions are lower than the worst case emission. By issuing a permit with the highest emission rate, ADEQ effectively relaxed the limit that would apply to all other products except for the worst-case product, which violates PSD requirements. Since the higher emission limit can be applied easily to a single product, ADEQ should have incorporated alternate operating scenarios into the final permit in order to provide a more stringent emission limit when producing other products. Based on the permit record, BRS did not propose, and ADEQ did not consider, any such alternate operating scenarios.

By establishing a GHG BACT limit "representing one potential product mix" (the highest emitting product mix), the Permit fails to meet the statutory definition of BACT for "all operating conditions" which will undoubtedly include lower emitting product mixes. The Permit should be vacated.

**10. BRS relied on unachievable and undemonstrated emission rates and emission factors in its modeling.**

**a. BRS relied on unachievable and undemonstrated emission rates and emission factors in its modeling PM/PM$_{10}$/PM$_{2.5}$.**

A critical requirement of the PSD application review process is a determination that the proposed BRS Facility will be outfitted to meet the BACT requirements. 42 U.S.C. § 7475(a)(4). Use of incorrect emissions data violates the data completeness requirements of 40 C.F.R. § 52.21(n) and Appendix W, § 8.1.2 and associated subsections. All of these regulations are part of the Arkansas PSD SIP. *See* APC&EC Reg. 19.904. The obligation for complete and accurate information is also found in APC&EC Reg. 19.404(C) and Reg. 26.409.

There is a discrepancy between the BACT $PM_{2.5}$ emission rates for natural gas sources at the BRS Facility, and the $PM_{2.5}$ emission factors used to model those sources in the air quality impact analysis. The emission factors used in the NAAQS modeling were less than 10% of the PM factors for such sources in EPA publication AP-42, and there was no demonstration in the permit application, or anywhere else for that matter, that BRS could actually achieve those

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 37

emission rates.  It is undisputed that the emission rates must be achievable if they are to be accepted as BACT.

It is common industry practice to use EPA AP-42 emission factors to calculate emissions for air permit applications and compliance unless more accurate vendor-specific or site-specific information is available. BRS based its $PM/PM_{2.5}/PM_{10}$ emissions estimates for a number of emission sources, including, but not limited to, SN04 – 19, SN20 – 21, and SN-22, SN-26, SN-27, SN-28, SN-29 and SN-39, on what BRS described as an EPA natural gas combustion study from the year 2010, as referenced in a document produced by the Minnesota Pollution Control Agency (the "Minnesota study").

EPA treats its emission factors program as part of its regulatory system. When EPA changes the emission factors program, it goes through a rulemaking process. When EPA makes changes to AP-42 that affect a wide range of facilities, it typically issues policy memos or guidance explaining to the regulated community how to handle the regulatory ramifications of the changes. In the absence of any update to AP-42 emission factors for natural gas combustion and any policy memo or guidance, using a different emission factor is not appropriate, unless the applicant has specific direct test data or engineering data to support it as applied to the facility proposed to be permitted. BRS submitted no test data or engineering data to support it.

The Minnesota study was based on 2004 data and the study explicitly states that the data presented is simply a spreadsheet that compiles preliminary data that was used as part of an effort by EPA to develop a method that could be used to test for condensable particulate matter.[22] These emissions factors are unproven and the EPA does not support their use. When the EPA revised its AP-42 factors in 2010, it did not include or adopt into AP-42 the emission factors set forth in the Minnesota study.

Since the data shown in the Minnesota study is based upon preliminary test data, the results of the study do not appear to have been available for public comment or peer review by the scientific community. Therefore, the validity of the data is unknown.

Based on the Minnesota study, BRS utilized an emission factor of 0.52 pounds per million standard cubic feet (lb/MMscf), which accounts for both filterable and condensable particulate matter. Using EPA AP-42, Section 1.4, the appropriate $PM/PM_{2.5}/PM_{10}$ emission factor is 7.6 lb/MMscf, which includes both filterable and condensable particulate matter. The emission factor used by BRS is 14 times less than that used in standard industry practice. Using the Minnesota study emission factor versus the AP-42 emission factor has a substantial effect on the $PM_{2.5}$ emissions estimated in the modeling for the subject sources.

---

[22] The study document further states that the data was generated based on the combustion of natural gas, process gas, and liquefied petroleum gas (LPG).

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 38

The modeled $PM_{2.5}$ emissions (Minnesota study) yield modeling results that are nearly equal to the annual NAAQS standard. Even small increases above modeled emission rates could result in a NAAQS exceedance. Given the NAAQS $PM_{2.5}$ annual modeling results, the validity of this emission factor is a significant issue. Since the $PM/PM_{2.5}/PM_{10}$ emission factor used by BRS is not adequately supported by scientific data, there is no basis to expect that these natural gas-fired emissions sources can actually achieve this level of emissions.

Therefore, the Permit does not comply with Title V requirements because it fails to contain terms and conditions necessary to enforce compliance with applicable requirements. Not only has BRS failed to demonstrate that BRS could achieve the low emission levels supporting its modeling, the emission limits in the Permit do not require compliance with those emission levels, and the test method specified in the Permit does not demonstrate compliance with those emission levels. The Permit should be vacated.

**b. BRS relied on improper emissions factors for electric arc furnaces ("EAF").**

The $PM_{2.5}$ emission limit specified in the PSD permit for each EAF is 0.0024 grains per dry standard cubic foot (gr/dscf). BRS proposed this emission factor but its origin is unknown and unsupported. Put simply, Nucor does not know where BRS came up with this emissions factor, which is significantly lower than BACT. Only one emission limit can be found that is close to the aforementioned limit: Osceola Steel Company in the State of Georgia (Georgia Permit No. 3312-075-0024-P-01-0), which has a permitted $PM_{2.5}$ limit of 0.0026 gr/dscf. However, this Georgia mill was never constructed and has therefore never demonstrated that even this higher limit is achievable. BRS's limit is even more stringent than the limit in the Georgia permit, and BRS has not demonstrated that this limit is achievable. While the difference in the emission limits is small, their difference in real terms is large. If source testing ultimately shows that the BRS EAF limit is not achievable and is only capable of achieving the same limit as the permitted, but never constructed, Georgia mill, hourly emissions from both EAFs and LMFs would increase from 43.2 lb/hr to 46.8 lb/hr and annual emissions would increase from 189.22 tpy to 204.98 tpy.

BRS's failure to demonstrate that the emission factors for EAFs are achievable violates the PSD rules and requires that the Permit be withdrawn and a new application submitted with a proper demonstration that the EAF factors are achievable.

**c. BRS misrepresented to ADEQ that vendor guarantees supported the achievability of emission limits for natural gas combustion sources.**

As discussed above, BRS failed to use the AP-42 emission factors approved by the EPA. Instead, based on the Minnesota study, BRS utilized an emission factor which is significantly

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 39

lower than the AP-42 factor. By doing so, BRS avoided a modeled violation of the law. However, BRS has never been able to prove that it can actually meet these incredibly low emission rates.

It is common industry practice to use EPA AP-42 emission factors to calculate emissions for air permit applications and compliance unless more accurate vendor-specific or site-specific information is available, i.e. vendor guarantees are a method to ensure achievability of emission limits. Written vendor guarantees are not required; however, in this case, BRS attempted to use vendor guarantees to assure ADEQ that it could meet its emission rates, which were significantly lower than the EPA-endorsed AP-42 rates. It communicated to ADEQ that the equipment manufacturer had <u>guaranteed</u> that the equipment could meet these rates. ADEQ witnesses testified that they exclusively relied on BRS's statements regarding the manufacturer's guarantee to determine achievability. However, the German supplier, SMS Siemag, never made any such guarantee.

Natural gas combustion equipment for the proposed BRS Facility was to be designed and supplied by SMS Siemag. SMS Siemag never supplied any written guarantees of the achievability of the very low PM emission rates for the natural gas combustion equipment to BRS. Regardless, BRS represented to ADEQ, and ADEQ accepted without qualification, that SMS Siemag had assured BRS that the equipment would meet the emission rate limits in the permit application based on the 2005 Minnesota study. Evidence produced by BRS in the lead-up to the February 2014 hearing, Docket 13-006-P, proved that this is untrue. SMS Siemag unequivocally told BRS during the public comment period not only that it was "unknown" if the natural gas combustion equipment could achieve the low emission rates represented by BRS in the permit applications, but also that SMS Siemag would not guarantee that the emission rates used by BRS in its modeling were achievable.

The evidence, along with testimony elicited at the hearing on this matter before the APC&EC, demonstrated that BRS, obviously concerned that the inability of the equipment to achieve the ultra-low emission rates would sink the project, instead of correcting or supplementing its filings as required by APC&EC Reg. 19.404 (C), elected to file a public comment, BRS Comment 13, seeking to be absolved from post-construction testing to confirm compliance with the permit limits. BRS deliberately withheld that information from ADEQ, the public, Nucor and EPA, preferring to "wait and see" what action ADEQ took on the requested modification to the Draft Permit to allow it to escape the post-construction confirmation of its ability, or inability, to achieve those low emission rates.

It is evident that BRS knew that the equipment vendor would not guarantee the permitted $PM_{2.5}$ emission rates for natural gas combustion units at the BRS Facility; yet BRS did not disclose this information to ADEQ. It is also evident that SMS Siemag was not aware of the ultra-low emission rates submitted by BRS to ADEQ as part of the permit applications and, more importantly, that BRS had falsely represented to ADEQ, and in turn to the public, that the

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 40

equipment manufacturer had verbally guaranteed that the ultra-low emission rates were achievable.

BRS's failure to inform ADEQ that its equipment vendor would not guarantee the $PM_{2.5}$ emissions from natural gas combustion equipment relates to and affects a host of natural gas combustion sources and is among the most material of terms of the BRS Permit. BRS's own expert, Mr. Hoffnagle, testified that use of the AP-42 $PM_{2.5}$ emission factors for natural gas combustion instead of the emission factors proposed by BRS would *significantly* increase $PM_{2.5}$ emissions. The sources for which SMS Siemag indicated in July 2013 that the emission rates were unknown are SN-04 – 19, SN-20 – 21, and SN-22, SN-26, SN-27, SN-28, SN-29 and SN-39. Further, during the public comment period after the issuance of the Draft Permit, the equipment manufacturer, SMS Siemag, communicated to BRS that it would not and could not guarantee the achievability of the low emission rates for the natural gas combustion sources, SN-22, SN-26, SN-27, SN-28, SN-29 and SN-39. Thus, because BRS's own equipment supplier would not guarantee the low emission rates used by BRS in its modeling demonstration, and because BRS concealed that fact from ADEQ and the public, BRS failed to demonstrate that its facility would not cause or contribute to a violation of the NAAQS.

Put simply, BRS did whatever was necessary to get a permit issued with the intent to subsequently come back to ADEQ down the road after the plant is built and in operation seeking a permit modification and imploring the ADEQ to modify the Permit to allow continued operation rather than enforcing the permit limits and issuing a cease and desist order. At that time, the deception and concealment will have been completed and the clear consequences of not requiring a proper pre-construction PSD demonstration by BRS will be thrown at the ADEQ to shift the effects of unsafe air quality onto the public. This practice wholly undermines the "pre-construction" review nature of the PSD process.

As detailed above, because the impacts of the BRS Facility are at or near the $PM_{2.5}$ NAAQS, use of either the AP-42 emission factors for natural gas combustion, or some intermediate value higher than the emission levels used to demonstrate compliance with the NAAQS, would almost certainly result in an exceedance of the NAAQS. BRS has never been able to demonstrate that the emission factors it used, based on the Minnesota study, are achievable. BRS assured ADEQ that the rates were achievable by stating that the vendor had guaranteed their achievability. This assurance was a lie. BRS has not demonstrated that these emission factors are achievable and thus it has not demonstrated that emissions from the BRS Facility will not cause or contribute to an exceedance of the NAAQS. Consequently, the Permit does not comply with applicable requirements. The Permit should be withdrawn and a new application submitted demonstrating that BRS can actually achieve the emissions rates it claims are achievable.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 41

### 11.    BRS failed to conduct an additional impacts analysis.

40 C.F.R. § 52.21(o) requires an application to analyze potential impacts resulting from residential, commercial, and industrial growth associated with the proposed facility. Likewise, Reg. 19.904(C)(1),(2),(3) states: "Where air quality impact analyses required under this part indicate that the issuance for a permit for any major stationary source or for any major modification would result in the consumption of more than fifty percent (50%) of any available annual increment or eighty percent (80%) of any short term increment, the person applying for such a permit shall submit to the Department an assessment of the following factors: (a) **Effects that the proposed consumption would have upon the industrial and economic development within the area of the proposed source; and (b) Alternatives to such consumption, including alternative siting of the proposed source or portions thereof.**" (Emphasis added.) Consistent with the wording of 52.21(o)(2), the guidance explains that the applicant needs to assess the amount of expected residential growth and expected commercial and industrial growth that will occur to provide goods and services to the new employees and to the proposed source itself. The applicant should then estimate the air pollutant emissions from this associated growth. APC&EC Reg. 19.904(C)(3) states that the detail of the assessment shall be "commensurate" with the degree of proposed increment consumption.

BRS's additional impacts analysis was wholly inadequate, disingenuously suggested no significant secondary growth would occur as a result of the BRS Facility, and, consequently, failed to satisfy the requirements of PSD. The entirety of BRS's additional impacts analysis related to associated growth consisted of the following statement: "The only increase in emissions from associated growth results from the increase in workers traveling to and from work. Emissions from this are assumed to be insignificant and would have a minor impact (if any) to the area." Section 6.1 of the Application, Rev. 2 of the permit application describes that the proposed project "will have no effect on construction and growth impacts."[23]  The section goes on to say that "growth will not be directly associated with the proposed plant in Mississippi County." Yet, in the same section the discussion goes on to say that the "proposed plant should have a positive impact on the economic climate of Osceola by providing jobs for the area work force." These statements that the plant will have no growth impact yet provide jobs are contradictory and do not provide an adequate basis for determining that there will be insignificant growth of related commercial and industrial development in support of the plant. This "analysis" directly contradicts the reality of industrial, commercial, and residential growth around new steel mills and further contradicts published reports and sworn testimony from BRS

---

[23] Additionally, the discussion of land availability, proximity to roads and access to the river on Pages 7-8 of the Draft Permit would not be necessary if BRS does not make a significant contribution to increment consumption, and, therefore, would not need to address Reg. 19.904(C) requirements.

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 42

representatives concerning growth expected to accompany construction and operation of the BRS Facility.

Further, the Executive Director of the Arkansas Economic Development Commission ("ADEC") stated in sworn testimony in Arkansas Public Service Commission Docket No. 13-032-P that estimates of the direct economic impact of BRS "do not include the impact that could be felt from mill customers who choose to locate near the mill to take advantage of a steady supply of steel and reduced transportation costs … The AEDC and BRS are already pursuing potential customers for the BRS's mill's output." Likewise, the Chairman and CEO of BRS testified, in the same docket: "Beyond BRS's payroll, there will likely be a number of suppliers customers that also locate in the area … From a customer perspective, we typically see steel service centers, steel processors, and pipe mills locate in close proximity to new mills in an attempt to reduce transportation costs and gain direct access to steel. From a support industry perspective, the BRS mill will have a number of support entities that will provide BRS with raw materials, maintenance services, material handling services, and various day-to-day needs such as cafeteria services."

BRS's additional impacts analysis made no mention of associated growth in the area due to increased truck and rail service to the site nor of the associated support industries that will accompany the proposed plant. Any new mobile sources brought into the area will consume increment against the PSD increments and will also consume a portion of the NAAQS limit. Likewise, no mention is made of any alternatives for increment consumption, including alternate sites for the BRS Facility.

Consequently, the additional impacts analysis fails to comply with the PSD regulations, and ADEQ should not have issued a Permit under these circumstances. BRS also failed to present alternatives to increment consumption as required by Reg.19.904(C). BRS's failure to include an adequate additional impacts analysis is in violation of the PSD rules and demands that the Permit be vacated.

**Relief Sought by Nucor:**

The purpose of this letter is to give notice of the deficiencies in the BRS Permit and the permitting process so that BRS is afforded a fair opportunity to rectify those deficiencies. Full resolution of these deficiencies requires BRS to finalize its emission unit design and layout, conduct proper site-specific pre-construction monitoring, conduct a proper modeling and air quality analysis that ensures compliance with the NAAQS, provide Nucor with all data necessary for Nucor to confirm that BRS's modeling and air quality analysis was conducted properly and ensures compliance with the NAAQS, and re-submit its air permit application to resolve the deficiencies identified above.  Specifically, BRS should re-submit its air permit application to address the following:

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 43

- Failure to conduct proper pre-construction monitoring for $PM_{2.5}$ at the site of the BRS Facility

- Failure to properly assess the receptor grid for modeling supporting BRS's air quality analysis

- Failure to include boundary receptors on public roads and in and around neighboring facilities in the BRS modeling supporting the BRS air quality analysis

- Failure to use representative monitoring data to establish background $PM_{2.5}$ value for the site of the BRS Facility

- Failure to model or otherwise consider the air quality impacts of secondarily formed $PM_{2.5}$ emissions from or associated with the BRS Facility

- Failure to model all emission sources

- Failure to correctly model fugitive emissions from the Melt Shop and Galvanizing Line

- Failure to model building conditions and downwash from nearby sources

- Failure to properly model fugitive windblown emissions

- Failure to properly estimate emissions from the storage piles

- Failure to model emissions based on permitted limits

- Failure to model facility emissions based on final emission unit design and layout

- Improper modeling of emissions from the Bunge facility

- Improper BACT analyses as described in Section 9 above

- Improper use of unachievable and undemonstrated $PM_{2.5}$ emission factors for emissions from EAFs and natural gas combustion sources as described in Section 10 above

BRADLEY MURCHISON KELLY & SHEA LLC

Mr. John Correnti
Honorable Teresa Marks, Director
Honorable Gina McCarthy, Administrator
May 30, 2014
Page 44

- Failure to conduct an additional impact analysis that properly considered growth
likely to occur as a result of the construction and operation of the BRS Facility

Should BRS fail to fully resolve its Permit in the manner set forth above, Nucor will seek declaratory, injunctive relief, and appropriate civil penalties, including attorneys' fees and costs, for each violation of the CAA, 42 U.S.C. § 7604(a), so that the deficiencies in the BRS Permit and the permitting process as identified herein can be rectified. Nucor believes this notice of violations and intent to sue sufficiently states the grounds for a suit against BRS under Section 304 of the CAA, 42 U.S.C. §§ 7604(a)(1) and (a)(3). Nucor's suit, when filed, may also address any violations revealed during the discovery process.

During the notice period, we would be pleased to discuss this matter further.

Yours very truly,

Bradley Murchison Kelly & Shea LLC

By:  David R. Taggart

David R. Taggart

cc:  Mr. David Stickler
Big River Steel, LLC
2027 E. State Highway 18
Osceola, AR 73207

Honorable Ron Curry
Regional Administrator
EPA Region VI
Fountain Place, 12th Floor
Suite 1200
1445 Ross Avenue
Dallas, TX  75202-2733